ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

first AMENDED
Complaint

JOSEPH FRANQUI,

Plaintiff,                          Case No. 1:26-cv-02867-DG-RML

-against-                          JURY TRIAL DEMANDED

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

STAFFLION LLC,

CLOVER LAKE MANAGEMENT, LLC d/b/a

THE PLAZA AT CLOVER LAKE,

THE PLAZA AT CLOVER LAKE,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

CATHOLIC HEALTH SERVICES, LLC

d/b/a CATHOLIC HEALTH GROUP,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.



RECEIVED
JUN 03 2026
PRO SE OFFICE

REC'D IN PRO SE OFFICE
JUN 3 '26 AM 10:56

1

FIRST AMENDED COMPLAINT

## I. INTRODUCTION

1. Plaintiff Joseph Franqui brings this action for retaliation following protected activity, including reports of unlawful workplace surveillance, wage violations, unsafe working conditions, and resident neglect, as well as Defendants' failure to pay wages and comply with federal and state labor laws.

2. Plaintiff was employed as Food Service Director. Prior to the November 2025 transition, Plaintiff exercised substantial operational authority, including preparing schedules, supervising staff, participating in hiring and disciplinary matters, and managing day-to-day dietary operations, subject to upper-management approval requirements. During and after the transition, Defendants significantly reduced Plaintiff's authority, requiring approval for routine operational decisions and exercising centralized control over Plaintiff's day-to-day work, such that Plaintiff functioned as a non-managerial employee in practice.

3. Plaintiff repeatedly reported unlawful and improper conduct, including wage practices, onboarding failures, workplace safety conditions, unlawful surveillance, resident safety concerns, and union-related issues affecting employees, including that certain employees were prevented from joining the union.

4. Plaintiff was terminated on November 19, 2025, by Defendants, including Defendant Meira Pirutinsky, shortly after making these complaints.

5. Plaintiff's termination followed his repeated complaints regarding unlawful conduct, including resident safety concerns and workplace violations.

6. Defendants continued to use and benefit from Plaintiff's labor and work product after his termination, including menus, operational systems, vendor relationships, and internal materials developed by Plaintiff.

7. The union failed to provide meaningful representation to Plaintiff and acted in coordination with management, including by failing to advocate on

Plaintiff's behalf during his termination and adopting Defendants' position without challenge.

## II. JURISDICTION AND VENUE

8. This Court has jurisdiction pursuant to federal law, including the Fair Labor Standards Act, 29 U.S.C. § 201 et seq., the National Labor Relations Act, 29 U.S.C. § 151 et seq., and ERISA, 29 U.S.C. § 1132.

9. Venue is proper in this District because the events giving rise to Plaintiff's claims occurred within this District.

## III. PARTIES

10. Plaintiff Joseph Franqui was employed by Defendants.

11. Defendants operated with overlapping employees, shared management personnel, and centralized control over operations and decision-making. Center Management Group functioned as the primary controlling entity overseeing operations, payroll, and management across affiliated entities, including Richmond 26 Operating and Esplanade Staten Island.

12. Defendant Local 713 IBOTU, UMD, ILA, is a labor organization representing employees at the facility.

13. Defendant Patrice Ficco exercised operational and managerial control over Plaintiff's employment, including supervision, hiring involvement, and participation in the transition process, and served as a primary point of contact for workplace operations and concerns.

14. Plaintiff observed Defendant Charles-Edouard Gros exercise substantial operational authority and control over facility operations and personnel, including directing operational decision-making and exercising authority over individuals holding ownership, management, and operational interests.

3

15. Defendant Meira Pirutinsky served as Vice President of Center Management Group and exercised primary control over staffing, scheduling, and operational decision-making, and was directly involved in the decision to terminate Plaintiff.

16. Defendant Jeff Elkins served in a dual role as shop steward and head of security, maintained access to workplace surveillance systems, and was present at Plaintiff's termination, where he failed to advocate on Plaintiff's behalf and aligned with management's position.

17. Defendants Aaron Bokchin and Alexander "Ali" Scharf exercised ownership and operational authority over Esplanade Staten Island and were involved in decisions relating to Plaintiff's employment, including hiring and approval of significant operational expenditures.

18. Upon information and belief, individuals affiliated with Defendant Catholic Health Services, LLC d/b/a Catholic Health Group, including Rachel Horowitz, exercised operational influence over the facility, participated in scheduling and staffing approvals, issued directives relating to operational and staffing matters, participated in StaffLion-related operational meetings, coordinated with Center Management Group personnel concerning facility operations affecting Plaintiff's work, communicated directly with Plaintiff concerning transition-related operational matters, and directed Plaintiff to provide master scheduling and operational information during the transition period.

19. Defendant Clover Lake Management, LLC d/b/a The Plaza at Clover Lake is an affiliated entity alleged to share common ownership, management, operational control, and personnel with other defendants. Upon information and belief, management personnel associated with The Plaza at Clover Lake, including Benjamin Fuoco and Stephen Kossluk, were aware of Plaintiff's impending termination before it occurred. On the day of Plaintiff's termination, Plaintiff's menus and operational work product were transmitted by Defendants Patrice Ficco and Meira Pirutinsky to personnel associated with The Plaza at Clover Lake shortly before Plaintiff's termination. Upon information and belief, personnel associated with The

4

Plaza at Clover Lake later participated in operational activities at Esplanade Staten Island following Plaintiff's termination.

20.    Defendant Woodmere Operating Company LLC d/b/a Esplanade of Woodmere is an affiliated entity alleged to share common ownership, management, operational control, and personnel with other defendants, including Esplanade Staten Island. Personnel associated with Esplanade of Woodmere, including Executive Director Hindel Jesselson, required Plaintiff to complete Form 1099 documentation as a condition of obtaining reimbursement for funds Plaintiff advanced to pay repair personnel. Defendant Aaron Bokchin was involved in arranging the repair work and reimbursement process described herein.

21.    Defendant Meridian Senior Living, LLC provided management services and/or exercised operational influence over affiliated facilities relevant to the allegations herein. Meridian Senior Living, LLC was the entity through which Plaintiff was reimbursed for funds Plaintiff advanced to pay repair personnel at the request of Defendants associated with Esplanade of Woodmere.

## IV. ADMINISTRATIVE PROCEDURES AND RELATED FILINGS

22.    Plaintiff filed administrative charges with the National Labor Relations Board ("NLRB") relating to the matters described herein.

23.    Plaintiff filed separate administrative matters concerning employer-related labor and retaliation issues; and union-related representation and interference issues.

24.    The NLRB matters referenced herein arise from events connected to Plaintiff's employment at Esplanade Staten Island and the subsequent operational transition involving Richmond 26 Operating LLC and related management personnel.

25. Certain NLRB matters referenced herein remain pending and/or under review.

26. Plaintiff includes allegations concerning retaliation, surveillance practices, union-related conduct, onboarding irregularities, workplace complaints, and related employment actions as factual background and supporting context for the claims asserted in this action.

27. Plaintiff further alleges that certain claims asserted herein arise independently under federal and state law and are not dependent upon final NLRB determinations.

## V. FACTUAL BACKGROUND

### A. Employment Background

28. Plaintiff previously worked with Defendants in a consulting capacity prior to formal employment and assisted with operational systems, menus, procedures, and dietary-related operations involving the facility.

29. Plaintiff formally began employment at Esplanade Staten Island on or about October 1, 2023, serving as Food Service Director / Executive Chef.

30. In or about October 2023, Plaintiff entered into a written Employment Agreement with Defendants.

31. Prior to entering into the written agreement, Defendants, through Defendant Patrice Ficco, offered to employ Plaintiff on an off-the-books basis, which Plaintiff declined in favor of lawful employment. Defendants had engaged in similar off-the-books employment arrangements with a prior Food Service Director.

32. Defendant Patrice Ficco participated directly in drafting and structuring Plaintiff's Employment Agreement and compensation arrangement.

33. As part of the Employment Agreement, Plaintiff negotiated for a three-month compensation review concerning compensation structure and payment terms, which Defendants agreed to conduct but never performed.

34. Plaintiff's responsibilities included dietary operations, staffing, scheduling, menu development, purchasing, vendor coordination, sanitation oversight, budgeting, and day-to-day operational management within the dietary department.

35. Plaintiff regularly worked alongside bargaining-unit employees and participated directly in daily facility operations.

36. Prior to the November 2025 transition, Plaintiff was regularly required to perform maintenance-related and non-managerial duties outside the scope of his position, including tasks ordinarily assigned to maintenance staff. Plaintiff was additionally directed to transport a vehicle belonging to Defendant Ali Scharf for inspection and cleaning.

37. During and after the transition period, Plaintiff could no longer independently approve overtime, finalize schedules, make certain routine purchases, utilize the company purchasing card without approval, or independently make various staffing-related decisions without upper-management involvement.

B. Protected Activity and Workplace Complaints

**Union Advocacy and Employee Representation Concerns**

38. Throughout Plaintiff's employment, Plaintiff regularly worked alongside bargaining-unit employees and advocated on behalf of employees concerning union-related issues, workplace treatment, staffing concerns, compensation issues, scheduling concerns, and operational matters affecting employees.

39. During 2024 through 2025, Plaintiff repeatedly advocated for employees attempting to enter the union, including employees Jazmin and Josefa ("Yvette").

40.     Plaintiff observed and reasonably believed that union access, treatment, and representation within the facility were inconsistently applied among employees and departments.

41.     Plaintiff raised concerns regarding delays, obstruction, and inconsistent treatment involving union participation, union eligibility, and employee representation.

42.     Plaintiff additionally directed employees to contact union representatives directly regarding representation concerns, benefit issues, and union-status disputes.

43.     In or around 2025, Plaintiff additionally questioned and raised concerns regarding selective wage increases provided to certain union-affiliated employees, including the shop steward and maintenance personnel, while other departments and employees did not receive similar treatment.

**Wage, Onboarding, and Workplace Conditions Concerns**

44.     Plaintiff additionally raised concerns regarding delayed or missing rate-of-pay notices, onboarding irregularities, and employees having trouble completing onboarding documentation and systems.

45.     Plaintiff also raised concerns regarding staffing shortages, spread-of-hours compensation issues, operational conditions, employee treatment, sanitation and cleanliness concerns affecting employee locker rooms and bathrooms, and workplace practices affecting employees within the facility.

46.     Plaintiff additionally raised concerns regarding employee compensation, payroll calculations, spread-of-hours pay, break deductions, and wage compliance. In communications with management, including Defendant Meira Pirutinsky, Plaintiff identified payroll discrepancies affecting employees, advised management that certain employees were not being compensated correctly, specifically raised concerns regarding ten-hour spread compensation, and requested that management explain how such compensation issues would be remedied going forward.

8

**Resident Care and Operational Concerns**

47.     Plaintiff raised concerns regarding employees being expected to perform resident wellness-monitoring, resident-supervision, medication-related, and other resident-care functions outside their ordinary job responsibilities, including concerns regarding residents allegedly being left unattended for extended periods of time and employees being asked to assist in monitoring or concealing medication-ingestion practices involving residents.

**PHI, Privacy, and Compliance Concerns**

48.     In or around 2023 through 2024, Plaintiff raised concerns regarding the handling, distribution, access, and transmission of sensitive resident medical information after receiving communications containing highly sensitive personal and medical details concerning residents. Plaintiff questioned the manner in which such information was distributed, accessed, and transmitted within workplace communications and management systems.

49.     Plaintiff additionally raised concerns regarding operational, licensing, and compliance-related practices occurring within the facility.

50.     Less than approximately two months after Plaintiff raised certain privacy and communication concerns, Defendants implemented changes to certain staff-notification and communication practices that limited employee visibility regarding the recipients of certain notifications and communications.

**Workplace Safety and Harassment Concerns**

51.     Plaintiff additionally raised concerns involving workplace treatment issues affecting employees, including concerns involving inappropriate conduct, harassment-related complaints, and employee safety concerns within the facility.

52.     Plaintiff additionally raised repeated concerns regarding unsanitary conditions within basement employee-accessed storage and work areas, including biohazard-related waste that remained unaddressed for an extended period despite repeated complaints to management.

53.     Plaintiff reasonably believed the failure to address such conditions reflected broader disregard for workplace sanitation, employee safety, and operational conditions within the facility.

### Escalating Hostility Following Protected Activity

54.     Following Plaintiff's complaints regarding union matters, employee compensation, spread-of-hours issues, workplace surveillance, harassment, resident care, privacy concerns, and workplace safety, Plaintiff observed increasing hostility, scrutiny, interference with his authority, monitoring, and retaliatory conduct by management personnel and individuals affiliated with the union.

### Surveillance, Monitoring, and Hidden Camera Concerns

55.     During Plaintiff's employment, Plaintiff became aware of increasing workplace surveillance and monitoring practices affecting employees within the facility.

56.     Plaintiff observed surveillance devices placed in employee-accessed areas of the building, including hidden or undisclosed monitoring devices.

57.     Plaintiff additionally became aware of surveillance concerns involving basement employee areas and kitchen-related work areas utilized by staff during daily operations.

58.     Plaintiff reasonably believed certain surveillance devices within the facility possessed audio-recording capability and that employees were not

10

clearly informed of, nor asked to consent to, the scope of workplace monitoring occurring within the facility.

59. Plaintiff observed increasing monitoring, surveillance, and scrutiny directed toward employees and workplace activities following operational complaints, workplace concerns, union-related activity, compensation complaints, resident-care concerns, and other protected activity.

60. Plaintiff additionally observed increased monitoring and scrutiny directed toward the dietary department by union-affiliated personnel, including instances in which workplace activities were recorded or reported to management in a manner Plaintiff reasonably believed was selective, exaggerated, misleading, or retaliatory in nature.

**Reduction of Authority after reporting protected activity & during Ownership Transition**

61. Beginning in or around February 2025, following Plaintiff's complaints concerning workplace surveillance, hidden cameras, employee privacy, harassment-related issues, and other workplace concerns, management personnel increasingly bypassed Plaintiff's authority by issuing directives directly to Plaintiff's staff and interfering with operational decisions within Plaintiff's department.

62. This reduction in authority continued throughout 2025 and accelerated during the ownership transition period.

63. Plaintiff additionally observed increasing interference involving menu decisions, staffing matters, and operational control within the dietary department.

64. During the transition period Plaintiff could no longer independently approve overtime, finalize schedules, make certain routine purchases, purchase from outside vendors, utilize the company purchasing card without approval, or independently make various staffing-related decisions without upper-management involvement.

11

65. Plaintiff additionally observed that staffing support previously available to him was reduced during this period, including reductions in cook support and assistant-manager assistance, requiring Plaintiff to absorb additional operational responsibilities while simultaneously exercising less authority over departmental operations.

66. During the transition period, Plaintiff was also inconsistently classified and referred to in various operational systems despite continuing to perform substantial operational and departmental responsibilities associated with his position at the direction of upper management.

67. Plaintiff reasonably believed the reduction of authority, increased scrutiny, and inconsistent treatment directed toward him intensified following his workplace complaints and protected activity and accelerated during the ownership transition period.

**Union Status, Benefits, and Onboarding Irregularities**

68. During the ownership and operational transition involving Richmond 26 Operating LLC and Center Management Group, Plaintiff and other employees were required to complete onboarding and employment-related processes under new systems and management structures.

69. Plaintiff raised concerns regarding delayed or missing rate-of-pay notices, incomplete onboarding documentation, inconsistent employment information, and confusion concerning the identity of the responsible employing entity.

70. Plaintiff reasonably believed employees were expected to continue working despite incomplete onboarding, unresolved payroll questions, and uncertainty concerning benefits, compensation structures, and employment classifications.

71. On or about October 23, 2025, Defendant Aaron Bokchin asked Plaintiff to leave the union and represented to Plaintiff that Plaintiff's compensation, benefits, sick time, and vacation benefits would otherwise remain

12

substantially the same. This was the first time any representative of management raised concerns regarding Plaintiff's union status or suggested that Plaintiff leave the union.

72.     On or about October 24, 2025, Defendant Patrice Ficco informed Plaintiff that he "technically" did not qualify for union membership despite previously structuring Plaintiff's compensation and employment arrangement in a manner that included union-related benefits and employer-paid health coverage.

**Stafflion Meeting and Pretextual Isolation**

73.     During the transition period, Defendants introduced or attempted to implement operational systems and scheduling processes associated with "StaffLion."

74.     Plaintiff was instructed to participate in virtual Microsoft Teams meetings involving StaffLion's scheduling and operational systems.

75.     Shortly before Plaintiff's termination, Plaintiff was directed to participate in a StaffLion-related Microsoft Teams meeting involving scheduling and operational matters connected to the upcoming Thanksgiving period.

76.     Plaintiff was instructed to remain in his office and continue participating in the meeting for an extended period of time while management personnel coordinated other activities within the facility.

77.     Plaintiff additionally observed repeated delays and irregularities during the meeting process, including instances in which portions of the meeting were restarted or extended.

78.     Defendants later asserted that they attempted to discuss Plaintiff's employment and compensation while Plaintiff was participating in a StaffLion-related Teams meeting conducted on November 18, 2025. During the meeting, Defendant Meira Pirutinsky, who was herself participating in the same Teams meeting, sent Plaintiff an email requesting that they speak regarding employment-related matters; however, Plaintiff did not view or respond to the message because he was actively participating in the meeting, which had been extended

significantly beyond its expected duration and required Plaintiff to remain in his office. Neither Defendant Pirutinsky nor Defendant Patrice Ficco verbally mentioned the email or otherwise raised the subject within the Teams meeting itself.

79. Plaintiff reasonably believed the StaffLion-related Teams meeting was utilized to isolate Plaintiff within his office while management personnel coordinated employment-related and operational activities outside Plaintiff's presence immediately prior to Plaintiff's confrontation and termination.

80. Personnel associated with StaffLion coordinated the Teams meeting and scheduling process despite StaffLion systems never being meaningfully implemented within facility operations.

81. Plaintiff additionally observed that multiple individuals associated with StaffLion maintained longstanding professional relationships with Defendant Charles Gros and/or individuals affiliated with Aryeh Stern and related senior-care operations. Plaintiff reasonably believed the StaffLion meeting process and related scheduling activities were utilized as part of the escalating scrutiny, pressure, intimidation, and retaliatory conduct directed toward Plaintiff during the transition period.

**Escalating Retaliation and Workplace Pressure**

82. Following Plaintiff's complaints concerning workplace surveillance, sexual-harassment concerns, wage issues, spread-of-hours compensation, resident care, union-related matters, onboarding irregularities, employee treatment, and other workplace concerns, Plaintiff observed increasing scrutiny, monitoring, interference with his authority, and direct management involvement in matters previously handled through Plaintiff. Plaintiff further observed that management personnel increasingly bypassed him, communicated directly with employees under his supervision, restricted his ability to independently manage departmental operations, and subjected him to increased pressure and inconsistent treatment. Plaintiff reasonably believed these actions

14

intensified during the ownership transition and following his continued workplace complaints.

83. Plaintiff additionally observed similar operational patterns affecting the prior Food Service Director, including reduction of authority, excessive workload, and continued operational reliance despite deteriorating employment conditions.

84. During the period immediately preceding Plaintiff's termination, Defendant Patrice Ficco, who had previously been accessible to Plaintiff concerning operational and employment matters, became increasingly unavailable and avoided substantive discussions regarding Plaintiff's employment terms, union status, and transition-related concerns.

**Confrontation and Termination**

85. On or about October 29, 2025, Plaintiff was called into a closed-door meeting involving Defendant Charles Gros and Defendant Meira Pirutinsky shortly after Plaintiff raised workplace, operational, and resident-care concerns during management discussions involving the new ownership structure. During the meeting, Plaintiff was instructed not to discuss "past issues," not to involve himself in matters concerning other departments, and not to continue raising certain operational and workplace concerns. The prior day, Plaintiff raised these concerns to Defendant Pirutinsky who informed Plaintiff that management did not want to focus on past issues.

86. On or about November 18, 2025, within minutes after participating in the StaffLion-related Teams meeting described herein, Plaintiff was confronted in person by management personnel concerning workplace matters, union-related issues, onboarding concerns, and Plaintiff's employment status.

87. In the period immediately preceding termination, Defendants continued directing Plaintiff to prepare schedules, menus, and operational materials for upcoming facility operations, including Thanksgiving scheduling,

15

while simultaneously coordinating with other personnel concerning ongoing operations.

88. On or about November 19, 2025, Plaintiff again raised concerns involving resident supervision and employee compensation practices, including spread-of-hours concerns affecting employees within the facility. On that same date, management personnel were actively communicating regarding Plaintiff's prior complaints concerning resident supervision and residents allegedly being left unattended for extended periods of time. Plaintiff reasonably believed these communications concerned the same resident-care concerns he had repeatedly raised during his employment.

89. Later that same day, Plaintiff was terminated by Defendant Meira Pirutinsky.

90. Plaintiff did not receive a written termination notice or formal written explanation for the termination despite being informed that such documentation would be provided.

**Post-Termination Events**

91. Plaintiff continued to receive communications, records, and information associated with Defendants' operations and employment systems following his termination.

92. Plaintiff additionally continued receiving union-related mail and communications following termination despite Defendants' prior statements concerning Plaintiff's alleged union ineligibility and supervisory classification, which Plaintiff reasonably believed reflected inconsistent characterization of his employment and union status before and after termination.

93. After termination, Plaintiff obtained additional employment-related documentation and records that contributed to Plaintiff's understanding of Richmond 26 Operating LLC's role in payroll administration and employment-related operations.

16

94. Plaintiff additionally observed inconsistencies involving payroll records, employment documentation, pay periods, onboarding materials, and rate-of-pay documentation following termination and reasonably believed certain employment-related records and onboarding-related documentation were delayed, incomplete, inconsistent, backdated, and/or generated after relevant employment events had already occurred.

95. Plaintiff additionally observed that Defendants continued utilizing operational systems, materials, procedures, menus, and departmental work product developed or implemented by Plaintiff during his employment and consulting relationship.

96. Plaintiff reasonably believed Defendants failed to provide clear explanations regarding payroll responsibility, employment classification, onboarding deficiencies, union-status inconsistencies, and termination-related matters following the conclusion of Plaintiff's employment.

97. Plaintiff additionally discovered further information concerning operational overlap, payroll administration, management involvement, and interrelated business functions among Defendants following termination.

98. Plaintiff reasonably believed the conduct occurring before, during, and after termination reflected continuing retaliation, operational inconsistency, and efforts to obscure responsibility concerning Plaintiff's employment, compensation, workplace complaints, and protected activity.

## VI. CORPORATE INTEGRATION, SUCCESSOR, ALTER EGO, AND JOINT EMPLOYER LIABILITY

A. Interrelated Operations and Centralized Labor Control

99. During Plaintiff's employment and the ownership transition described herein, Defendants operated through overlapping management structures, coordinated operational systems, and interrelated employment practices affecting Plaintiff and other employees within the facility.

100. At all relevant times, Defendants operated through interrelated entities and management structures in a manner that blurred corporate distinctions and obscured the identity of the true employing entity.

101. Defendants exercised centralized control over payroll administration, onboarding procedures, scheduling, operational management, staffing matters, labor relations, hiring, firing, compensation structures, employment agreements, and day-to-day employment-related functions affecting Plaintiff and other employees.

102. Management personnel associated with Defendants exercised overlapping authority concerning operational decisions, onboarding administration, scheduling matters, payroll-related issues, employment classifications, and workplace operations.

103. Plaintiff reasonably believed Defendants coordinated employment-related and operational functions through overlapping management personnel and interrelated operational practices during and after the ownership transition period.

104. Defendants operated as a single integrated enterprise and/or joint employers with respect to Plaintiff's employment.

105. Upon information and belief, StaffLion maintained operational and business connections with individuals and entities associated with Defendants, including individuals affiliated with Center Management Group and related operations. Plaintiff further observed that multiple individuals participating in StaffLion-related meetings and operational activities previously worked with or were affiliated with Defendant Charles Gros, Autumn Lake Healthcare Group, and/or entities associated with Aryeh Stern, who Plaintiff reasonably believes maintained longstanding professional and business relationships with Defendant Charles Gros in connection with senior-care operations, healthcare-related operations, and real-estate investments. Plaintiff additionally observed that StaffLion personnel coordinated operational meetings and scheduling-related activities during the transition period despite the purported StaffLion systems never being fully implemented within day-to-day facility operations.

B.  Ownership Transition and Payroll Confusion

106.    Prior to the operational transition described herein, Plaintiff was paid through Esplanade Staten Island and reasonably understood Esplanade Staten Island to be his employer.

107.    Following the transition period, payroll administration, onboarding systems, operational management, and employment-related processes increasingly involved Richmond 26 Operating LLC, Center Management Group, and related management personnel.

108.    Following the transition, payroll was processed through Center Management Group and issued under Richmond 26 Operating and/or Esplanade Staten Island, without clear disclosure of the employing entity.

109.    Plaintiff reasonably believed employees were expected to continue working during the transition despite unresolved questions concerning payroll responsibility, benefits administration, onboarding obligations, and employment classifications.

110.    Plaintiff observed inconsistencies involving payroll systems, onboarding systems, rate-of-pay documentation, employment records, scheduling systems, employer-identification practices, and employment-related documentation during and after the transition period, including records that were delayed, incomplete, inconsistent, and/or backdated.

111.    Plaintiff additionally observed that management personnel provided inconsistent statements regarding the identity of the responsible employing entity, including references to "Dumont" and "Center Management" concerning payroll and operational responsibility. Plaintiff further observed that management personnel, including Defendant Meira Pirutinsky on or about November 11, 2025, directed employees to leave certain onboarding and employment-related fields blank, including employer-identification and location-related information, so that the employer could later complete or modify such information.

112. Plaintiff reasonably believed Defendants failed to clearly identify the entity responsible for wages, payroll administration, onboarding obligations, benefits administration, and employment-related responsibilities affecting Plaintiff and other employees.

113. Plaintiff did not fully understand Richmond 26 Operating LLC's role in payroll administration and employment-related operations until after termination through later employment-related records and documentation.

114. Richmond 26 Operating issued payroll while operating under a d/b/a associated with Esplanade Staten Island. Plaintiff first encountered the name "Richmond 26 Operating" through an employee portal and was not informed of its role or relationship to Plaintiff's employment. Plaintiff did not understand Richmond 26 Operating to be his employer until after termination, including through a backdated rate-of-pay notice identifying Richmond 26 Operating as the employer.

C. Union Reclassification During Transition

115. During the transition period, Plaintiff observed inconsistencies involving union-status determinations, supervisory classifications, employee categorizations, and benefit eligibility affecting employees within the facility.

116. On or about October 23, 2025, Defendant Aaron Bokchin asked Plaintiff to leave the union and represented to Plaintiff that Plaintiff's compensation, benefits, sick time, and vacation benefits would otherwise remain substantially the same.

117. On or about October 24, 2025, Richmond 26 Operating changed its d/b/a designation to Esplanade Staten Island. On that same date, Defendant Patrice Ficco informed Plaintiff that he "technically" did not qualify for union membership despite previously treating Plaintiff as eligible. Defendant Ficco was directly involved in drafting Plaintiff's employment agreement and compensation structure. This was the first time Defendant Ficco raised any issue regarding Plaintiff's union eligibility. Upon information and belief, the new operator also

refused to recognize Plaintiff's existing employment agreement and prior classification despite continuing to utilize Plaintiff in the same operational role during the transition period.

118. Plaintiff's compensation included multiple payment components, including standard payroll and additional employer-issued payments outside the regular payroll structure. Defendants stated that Plaintiff would receive union coverage and benefits despite Plaintiff questioning whether such arrangements were consistent with his management role. During the November 2025 transition, Defendants reversed course and questioned Plaintiff's union eligibility despite previously treating Plaintiff as union-eligible and collecting union dues.

119. Plaintiff reasonably recalls that Defendant Patrice Ficco represented that although Plaintiff would allegedly not receive certain union annuity-related benefits, Defendants would otherwise maintain comparable compensation and benefits through alternative arrangements.

120. Despite these representations, Plaintiff additionally observed that union dues continued to be deducted from Plaintiff's compensation for November 2025, which Plaintiff reasonably believed was inconsistent with Defendants' position regarding Plaintiff's alleged union ineligibility and supervisory classification.

121. Plaintiff additionally observed that onboarding materials provided during the transition period referenced weekly union-related deductions despite failing to clearly identify the applicable union and/or provide health-plan summaries or related benefit documentation typically associated with such enrollment materials.

122. Plaintiff additionally asked whether certain union-related onboarding forms could be skipped, in order to complete onboarding requirements and reasonably recalls that Defendant Meira Pirutinsky did not provide a direct response to those questions.

123. During the onboarding process, Plaintiff reasonably believed Defendants failed to clearly explain what health coverage, benefit structure, or replacement benefit package would apply following the operational transition,

21

including whether Plaintiff's prior union-related and employer-paid health coverage arrangements would remain in effect or be replaced. Plaintiff additionally observed that onboarding materials did not include summary-plan documentation, benefit summaries, or clear explanations typically associated with health-coverage enrollment and union-related deduction materials, contributing to confusion regarding Plaintiff's benefits and employment classification during the transition period.

124. During the onboarding process and after the operational transition had already begun, Plaintiff raised questions concerning benefits and health-coverage arrangements. Defendant Meira Pirutinsky responded in substance that an employee manual and benefit guide addressing the full benefit package would be provided in the future, which Plaintiff reasonably believed confirmed that employees were expected to complete onboarding and continue working despite benefit-related information remaining incomplete and unresolved at that time.

125. Plaintiff communicated concerns relating to union status, compensation, benefits, and employment-related issues through emails directed to management personnel on or about November 15 and November 17, 2025, including communications directed to Defendant Meira Pirutinsky. Plaintiff reasonably recalls that Defendant Pirutinsky first directly addressed union-related issues through an email communication received at approximately 12:24 a.m. on November 18, 2025, shortly before Plaintiff's termination.

126. Plaintiff reasonably believed Defendants inconsistently characterized Plaintiff's employment status and supervisory role while simultaneously limiting Plaintiff's independent authority and discretion despite continuing to require Plaintiff to perform significant operational and departmental responsibilities. Plaintiff further reasonably believed Defendants were attempting to reclassify his union status during the transition while simultaneously reducing the managerial authority that Defendants later relied upon to claim Plaintiff was ineligible for union representation.

D. Shared Workforce and Operational Continuity

127. Despite changes involving payroll systems, onboarding administration, management structure, and corporate designation, facility operations continued without meaningful interruption during the transition period. Plaintiff reasonably believed Defendants continued substantially the same operational functions, workforce structure, management activities, services, and day-to-day business operations throughout and after the transition period.

128. Upon information and belief, the facilities and entities operated in a coordinated and interrelated manner, including shared management functions, staffing oversight, food-service coordination, dissemination of Plaintiff's work product, operational coordination, and cross-facility involvement.

129. Personnel affiliated with Center Management Group and related operational entities regularly participated in onboarding activities, staffing matters, scheduling processes, operational functions, and management-related activities affecting the facility.

130. Defendants utilized a shared workforce across entities and facilities. Personnel affiliated with Center Management Group and related locations regularly performed operational work at Esplanade Staten Island during the transition and operational periods described herein.

131. Plaintiff additionally learned personnel affiliated with The Plaza at Clover Lake and related operations associated with Defendant Charles Gros appeared at Esplanade Staten Island during the transition period and interacted with employees within Plaintiff's department and operations. Plaintiff reasonably believed such visits and interactions were connected to evaluation, operational oversight, intimidation, and/or transition-related activities affecting employees associated with Plaintiff. Following such interactions, employees associated with Plaintiff expressed discomfort concerning the conduct and presence of such personnel, including employees with longstanding working relationships with Plaintiff.

132. Plaintiff additionally observed operational overlap involving personnel, systems, scheduling structures, payroll administration, onboarding

procedures, and management functions among Defendants and related operational entities and reasonably believed Defendants operated through coordinated and interrelated operational structures lacking meaningful separation with respect to labor control, payroll administration, onboarding administration, management authority, and day-to-day operational functions affecting employees within the facility.

## VII. UNLAWFUL SURVEILLANCE

133.    A concealed surveillance device was placed in an employee locker room and/or changing area without notice or consent.

134.    The device in the locker room was disguised as a carbon monoxide detector and was not readily identifiable as a camera by employees.

135.    A similar concealed surveillance device of the same type was installed in a basement employee break room, also disguised as a carbon monoxide detector and not readily identifiable as a camera by employees.

136.    Cameras were positioned in operational areas, including the kitchen, with coverage directed toward Plaintiff's workspace and office area. Upon information and belief, certain kitchen surveillance devices were capable of recording audio.

137.    Upon information and belief, surveillance devices capable of recording audio existed in areas of the facility other than the kitchen.

138.    Although signage existed in certain areas referencing audio and video recording, such signage did not provide meaningful notice or disclosure of the nature, scope, or locations of surveillance, and employees did not provide informed consent.

139.    In or about one week prior to the November 2025 transition, biometric timekeeping systems, including facial recognition technology, were installed.

140.    Employees were required to use both existing and newly installed timekeeping systems.

141. Plaintiff observed that employees were instructed to register within facial-recognition timekeeping systems and reasonably believed employees feared adverse consequences if they failed to comply.

142. Employees were not provided consent forms or disclosures regarding biometric data collection.

143. Plaintiff additionally observed that biometric and facial-recognition timekeeping systems were installed and/or administered by individuals affiliated with Center Management Group, including Vinny Vinitsky.

144. Defendants did not provide any written policy regarding the retention, storage, or destruction of biometric data.

145. Upon information and belief, such audio recording devices existed prior to Plaintiff's employment and remained in operation throughout Plaintiff's employment.

146. Upon information and belief, Defendants maintained multiple surveillance systems, including at least two separate camera systems operating concurrently.

## VIII. SURVEILLANCE ABUSE

147. Surveillance systems maintained by Defendants, including multiple concurrent camera systems, were accessible remotely.

148. Defendant Jeff Elkins, acting as head of security, had primary access to such systems, was able to monitor surveillance remotely from outside the facility, including from personal devices, and exercised substantial control over the surveillance systems without meaningful oversight.

149. Surveillance devices were installed and maintained under the direction of Defendant Jeff Elkins, including installation occurring outside normal business hours. Upon information and belief, certain surveillance devices, including those placed in employee areas, were installed under the pretense of addressing operational concerns such as theft, without full disclosure regarding their nature, placement, or scope. Upon information and belief, certain

25

surveillance devices were physically installed by an individual known to Plaintiff as "Shammy," acting at the direction of Defendant Jeff Elkins and/or facility management personnel.

150. Following Plaintiff's complaints regarding unlawful surveillance, including the concealed locker-room camera, surveillance activity increased and became more focused on Plaintiff and his department. Plaintiff was on medical leave when the concealed locker-room camera issue arose. Plaintiff became involved in reporting and addressing the matter and, as a result of the ensuing workplace conflict and management response, curtailed his medical leave and returned to work before his shoulder had adequately healed.

151. Upon information and belief, Defendant Elkins actively utilized surveillance systems to review and collect video footage of employees, including bargaining unit employees, both upon request and on his own initiative.

152. Internal communications reflect that Defendant Elkins provided video footage and observations to management, including instances in which he independently reviewed footage and reported employee conduct without being directed to do so.

153. Surveillance systems were therefore used not solely for general security purposes, but as a tool to monitor employees, document alleged violations, and proactively report alleged misconduct to management in support of disciplinary measures, including write-ups and suspensions.

## IX. UNION MISCONDUCT

154. The union was present during Plaintiff's termination but failed to advocate on Plaintiff's behalf and instead adopted management's position.

155. The union accepted Defendants' version of events without conducting an independent investigation and failed to inquire into material issues, including whether Plaintiff's authority, discretion, and managerial responsibilities had been substantially reduced prior to termination.

26

156. The union refused to represent Plaintiff following his termination and asserted that Plaintiff was not a member, despite having previously accepted union dues and provided union-related benefits, including deductions taken through November 2025, the same month in which Plaintiff was terminated.

157. Following his termination, Plaintiff submitted formal written requests dated February 11, 2026, and March 10, 2026, to the union and associated benefit fund seeking plan documents, contribution records, hours reported, and related information concerning his participation and benefits, including documents required to be provided to plan participants. The union and/or associated benefit entities failed to respond within the time required by law and have not produced the requested records to date, in violation of their obligations to provide such information.

158. Upon information and belief, the union failed to challenge Defendants' transition of operations as a successor employer, despite substantial continuity in workforce, management, and operations.

159. Upon information and belief, the union permitted interference with employee membership, including situations where employees attempting to seek union assistance were redirected through Defendant Jeff Elkins, resulting in delays or obstruction of membership.

160. Upon information and belief, Defendant Jeff Elkins, acting in a dual role as shop steward and head of security, exercised influence over union-related matters affecting employees, including matters involving membership and compensation, creating a conflict of interest between union representation and management.

161. Internal communications reflect that Defendant Elkins provided video footage, recordings, reports, and observations regarding employees, including union members, to management both upon request and on his own initiative, including at times when he was not physically present at the facility. Defendant Elkins was relied upon by management as a source of surveillance-based information used to monitor workplace activity, evaluate employee conduct, and support disciplinary actions.

162. These actions created both actual and apparent surveillance of employees, including union members, contributed to a chilling effect on employee rights, and blurred the line between union representation and management enforcement, causing employees to reasonably believe their activities were being monitored and reported to management by an individual simultaneously acting as a union representative.

163. The union failed to provide Plaintiff with a meaningful opportunity to challenge his termination, failed to provide any appeal process, and failed to return union dues and related benefits, including annuity contributions, despite representations that such amounts would be returned.

## X. WAGE, ONBOARDING, AND RECORDKEEPING VIOLATIONS

164. Plaintiff performed off-the-clock work, including responding to calls, texts, and emails outside working hours, performing work off premises, and responding to work-related communications while on vacation and medical leave. Plaintiff was rarely compensated for such work and was expected to remain continuously available, including being told that managers must always be available.

165. Following the November 2025 transition, timekeeping systems were inconsistent, and employees received conflicting instructions regarding clocking in.

166. Defendants failed to pay spread-of-hours compensation.

167. Defendants acknowledged that Plaintiff was owed unpaid wages, including compensation for hours worked, but despite such acknowledgment failed and refused to pay those wages.

168. Defendants failed to provide Plaintiff with final wages within the time required by law following termination.

28

169. Payroll practices were irregular, including delayed payroll, combined final wages, and post-dated payments, including payments reflecting periods after Plaintiff's termination.

170. Onboarding systems were improperly administered, including failure to verify employee emails before sending onboarding links, failure to provide adequate instructions, failure to verify identification, failure to provide union information or benefit summaries, issuance of standardized forms regardless of age or applicability, use of generalized onboarding links requiring employees to create login credentials without individualized instructions or documentation, and instructions directing employees to leave required onboarding fields blank.

171. As a result of such system failures, Plaintiff was required to assist employees after hours with onboarding and related issues.

172. Employment, payroll, and onboarding records were incomplete, inaccurate, altered, and/or improperly maintained, and Defendants failed to ensure accurate, complete, and legally compliant employment documentation.

173. Defendants failed to provide clear and complete post-termination documentation, including a termination letter, final pay breakdown, and a clear explanation of Plaintiff's separation and benefits, despite representing that such documentation would be provided.

174. Defendants failed to provide reasonable assistance or accommodation to employees who could not read, write, or were not technologically proficient, despite Plaintiff informing Defendants of such limitations. As a result, those employees were unable to complete onboarding and did not receive their wages in a timely manner, further demonstrating systemic deficiencies in Defendants' onboarding and payroll processes.

## XI. IMPROPER 1099 ISSUANCE AND TAX LIABILITY SHIFTING

175. Plaintiff was directed by Defendants, including Defendant Aaron Bokchin, to coordinate and arrange for third-party repair services on behalf of Defendants' facilities.

176. Plaintiff did not operate an independent repair business and was not engaged as an independent contractor for such services.

177. At Defendants' direction, Plaintiff utilized personal funds to pay repair personnel to ensure timely completion of work necessary for Defendants' operations.

178. Plaintiff reasonably understood such payments to be made on behalf of Defendants and expected reimbursement without personal financial consequence, consistent with prior repair-related transactions at the Esplanade Staten Island location.

179. At the Woodmere location, Defendant Hindel Jesselson, acting as a director, manager, and/or agent of Defendant Woodmere Operating Company and/or related entities, participated in, coordinated, and/or was aware of repair-related work involving Plaintiff's use as an intermediary for operational payments and repair coordination. Plaintiff coordinated multiple repair-related matters involving the Woodmere facility at the direction of Defendant Aaron Bokchin and additionally transported operational supplies and chemicals between Woodmere and Esplanade as part of coordinated operational activities involving Defendants. Defendant Hindel Jesselson communicated directly with Plaintiff through emails and text messages concerning repair coordination and expressed preference for continued use of repair personnel previously utilized at Esplanade despite the absence of completed tax documentation.

180. Defendant Aaron Bokchin informed Plaintiff that Plaintiff would be reimbursed for payments made on behalf of Defendants in connection with third-party repair personnel, including circumstances in which such personnel did not complete or submit required tax documentation. Upon information and belief, Defendants were aware that certain repair personnel had previously performed work and been compensated without completion of required tax forms, yet

30

nevertheless directed Plaintiff to act as an intermediary for such payments and subsequently characterized the reimbursements as taxable income.

181. Defendant Patrice Ficco emphasized cost-based decision-making, including statements that Defendants were "loyal to the cheapest price." Plaintiff reasonably believes the actions of Defendants Aaron Bokchin, Patrice Ficco, and Hindel Jesselson reflected coordinated decision-making across ownership, management, and facility-level operations in directing Plaintiff to act as an intermediary for payments and subsequently mischaracterizing reimbursements as taxable income.

182. Plaintiff was not informed in advance that such reimbursements would be treated as nonemployee compensation and did not become aware of such treatment until after the repair personnel had been paid using Plaintiff's personal funds, at which point the financial obligation had already been incurred.

183. Plaintiff received reimbursement relating to the repair-related transactions through entities and/or accounts associated with Meridian Senior Living. Meridian-related identifiers appeared on Plaintiff's banking records, reimbursement-related records, tax-related documentation, and communications involving Defendant Hindel Jesselson. Plaintiff reasonably believed Meridian Senior Living maintained operational and/or financial relationships with Woodmere-related operations and entities associated with Defendants.

184. Defendants subsequently issued Plaintiff a Form 1099-NEC characterizing such reimbursements as taxable income.

185. The amounts reflected on the Form 1099-NEC were not compensation for services performed by Plaintiff but rather reimbursements for funds Plaintiff advanced and paid to third-party repair personnel on Defendants' behalf. Plaintiff derived no profit or financial gain from these transactions, and the reported amounts did not represent compensation retained by Plaintiff.

186. By issuing the Form 1099-NEC under these circumstances, Defendants improperly shifted tax reporting obligations and potential tax liability onto Plaintiff, causing financial harm and administrative burden, including the need to dispute the characterization of such payments with tax authorities.

Plaintiff reasonably believes Defendants knowingly and willfully mischaracterized reimbursements as independent-contractor income despite understanding that the payments represented business expenses advanced on Defendants' behalf.

## XII. RESIDENT NEGLECT AND FAILURE TO PROVIDE ADEQUATE LEVEL OF CARE

187. During Plaintiff's employment, Plaintiff repeatedly observed and raised concerns regarding resident neglect, inadequate supervision, insufficient staffing, and residents requiring levels of care and monitoring exceeding what Plaintiff reasonably believed the facility was equipped or staffed to provide. Plaintiff observed residents left unattended for extended periods of time, including residents requiring assistance with meals, supervision, and daily activities.

188. Plaintiff repeatedly raised concerns to management regarding resident welfare, staffing limitations, supervision failures, and operational practices affecting resident safety, including concerns involving residents allegedly being left in common areas for extended periods without proper monitoring or assistance. Plaintiff additionally objected to requests and practices Plaintiff reasonably believed improperly shifted resident-care responsibilities onto non-clinical staff and departments outside their ordinary job duties.

189. Plaintiff further objected to medication-related practices involving non-clinical personnel and reasonably believed management became increasingly hostile toward Plaintiff after Plaintiff repeatedly raised and refused to ignore resident-care and supervision concerns. On the date of Plaintiff's termination, management communications specifically addressed Plaintiff's prior complaints regarding residents allegedly being left unattended for extended periods, which Plaintiff reasonably believed further connected his complaints and protected activity to the retaliatory actions described herein.

## XIII. DISCRIMINATORY TREATMENT AND UNEQUAL CONDITIONS

190. Defendants engaged in discriminatory practices affecting residents based on disability, cognitive condition, level of care needs, and perceived social acceptability within the facility. Plaintiff observed and objected to operational practices and discussions involving the treatment, placement, and separation of residents based upon cognitive condition, level of care needs, appearance, behaviors associated with impairment, and complaints from other residents. Plaintiff reasonably believed certain residents requiring aides, supervision, or higher levels of care were viewed by management as undesirable or negatively affecting the facility's appearance.

191. Plaintiff was at times directed to accommodate resident social preferences, seating disputes, and separation-related requests involving residents with cognitive decline, disabilities, visual impairments, or increased care needs in a manner Plaintiff reasonably believed extended beyond ordinary dietary responsibilities and resembled assisted-living or nursing-level supervision and coordination responsibilities.

192. Plaintiff objected to such practices and repeatedly maintained that residents should be treated equally and not segregated, isolated, or treated differently based upon disability, cognitive condition, appearance, or level of care needs. Plaintiff reasonably believed his objections to these, and other operational practices contributed to increasing hostility and retaliation directed toward him by management personnel.

## XIV. FAILURE OF BUILDING SUPERVISION, SECURITY, AND RESIDENT MONITORING

193. Plaintiff repeatedly observed and raised concerns regarding failures involving front desk supervision, building monitoring, resident movement, overnight security practices, visitor monitoring, and operational

oversight within the facility. Plaintiff reasonably believed inadequate staffing, poor supervision, and monitoring failures created risks affecting resident safety, building security, and workplace operations.

194. Plaintiff observed that security and front desk personnel were at times inattentive, sleeping, distracted from monitoring responsibilities, or focused on matters unrelated to resident and building supervision, while Plaintiff and other non-security staff were increasingly expected to assist with resident monitoring, wellness checks, and supervision-related responsibilities outside their ordinary departmental duties.

195. Plaintiff repeatedly reported these concerns to management, including concerns regarding unauthorized access risks, resident supervision failures, and inadequate monitoring practices. Plaintiff reasonably believed management was increasingly focused on scrutiny and monitoring toward Plaintiff and his department while failing to adequately address broader operational and security deficiencies within the facility.


## XV. MISREPRESENTATION OF CARE LEVEL

196. During Plaintiff's employment, Plaintiff observed that residents within the facility often required levels of supervision, assistance, monitoring, and care exceeding what Plaintiff reasonably understood to be consistent with an independent-living environment. Plaintiff raised concerns regarding resident-care needs, supervision issues, staffing limitations, and operational practices affecting resident welfare and safety.

197. Plaintiff additionally observed that employees, including Plaintiff and dietary staff, were at times expected to assist with resident monitoring, wellness checks, supervision-related issues, and operational responsibilities extending beyond ordinary departmental duties due to staffing limitations, resident-care demands, and ongoing operational conditions within the facility. Plaintiff repeatedly objected to and raised concerns regarding these practices and

reasonably believed his refusal to simply accept or ignore such conditions contributed to increasing hostility, scrutiny, retaliation, and pressure directed toward him by management personnel.

## XVI. MEDICAL STEERING AND THIRD-PARTY CONTROL

198. Plaintiff observed ongoing coordination and operational involvement between facility management and certain third-party providers and reasonably believed aspects of those relationships raised concerns regarding resident services, provider access, care coordination, operational oversight, and regulatory compliance. Plaintiff raised concerns regarding provider interactions, the handling of resident-related information, and operational practices involving such third-party personnel during his employment.

## XVII. PRIVACY VIOLATIONS

199. Sensitive resident medical and personal information, including medical documentation, medical cards, financial records, Social Security information, and trust-related documents, was accessed, transmitted, and shared through internal communications, including email systems, among facility personnel and, at times, third-party providers, without adequate safeguards, privacy protections, or limitations on access.

200. Upon information and belief, Defendants failed to implement appropriate safeguards, policies, or controls to protect resident medical and personal information from unauthorized access or disclosure, creating a risk of misuse and unauthorized dissemination of sensitive medical and financial information.

201. Plaintiff raised concerns regarding the handling and transmission of such information, including the scope of access and lack of safeguards. Defendants failed to take corrective action and continued permitting the

transmission and sharing of sensitive resident information in a manner Plaintiff reasonably believed was inconsistent with accepted privacy and data-protection practices.

## XVIII. ENVIRONMENTAL VIOLATIONS

202.    During Plaintiff's employment, Plaintiff repeatedly dealt with operational, maintenance, plumbing, refrigeration, water-system, and environmental-related issues affecting the facility, including conditions Plaintiff reasonably believed posed sanitation, safety, operational, and regulatory concerns impacting residents, employees, and food-service operations. Plaintiff observed recurring plumbing, water-system, leak, flooding, and maintenance-related issues, including repairs performed without what Plaintiff reasonably believed to be appropriate permits, inspections, or qualified personnel. Plaintiff repeatedly raised concerns regarding these conditions and reasonably believed Defendants failed to timely address or remediate them despite ongoing complaints and operational difficulties.

203.    Plaintiff additionally observed environmental and facility conditions involving mold, ventilation failures, refrigeration-related issues, excessive heat, and other building-maintenance deficiencies that Plaintiff reasonably believed adversely affected employees, residents, and facility operations. Plaintiff repeatedly raised concerns regarding such conditions and reasonably believed corrective action was delayed, incomplete, or insufficient.

204.    Plaintiff further observed conditions involving waste management, sanitation concerns, pest-related issues, and other environmental conditions that Plaintiff reasonably believed required greater attention and remediation than Defendants provided. Plaintiff reasonably believed these conditions reflected broader failures involving maintenance oversight, operational management, and regulatory compliance.

## XIX. INTIMIDATION AND TERMINATION

205. On or about October 29, 2025, one day after Plaintiff raised concerns to Defendant Pirutinsky regarding prior issues and deficiencies within the facility, Plaintiff met Defendant Charles Gros for the first time. During this meeting, Plaintiff was admonished and warned against raising concerns regarding past issues or matters outside his department and was instructed to focus only on forward-looking matters. Plaintiff was further advised that raising such concerns could result in adverse employment action, including termination.

206. On or about November 18, 2025, Plaintiff encountered Defendant Charles Gros for the second time. During this interaction, Defendants confronted Plaintiff regarding his employment, union status, onboarding requirements, and employment classification in a confined office setting, applied pressure regarding his employment status, and restricted Plaintiff's ability to exit, limiting Plaintiff's freedom of movement. Defendant Gros further demanded that Plaintiff identify his own employment classification despite Plaintiff's prior written requests for clarification of his role and employment terms, which had not been answered in emails sent the day before.

207. Plaintiff requested union representation during the confrontation and specifically identified Jeff, the union shop steward, as his representative. Defendant Gros initially indicated that he was unfamiliar with Jeff's role and asked Plaintiff who Jeff was. Plaintiff responded that Jeff was the shop steward and stated that he would not continue the discussion without union representation present. Upon being informed of Jeff's role, Defendant Gros ceased the immediate confrontation and moved away from the doorway.

208. Within approximately thirty minutes, Jeff arrived for his scheduled shift and clocked in. Within one minute of his arrival, Defendants Gros and Pirutinsky exited Defendant Patrice Ficco's office, after which Defendant Pirutinsky returned to retrieve Ficco. Defendants Gros, Pirutinsky, and Ficco then approached Jeff at his front desk post, and all four individuals proceeded together into Ficco's office. They remained inside for approximately thirty minutes, after which they exited separately within a minute or two of each other, leaving

37

Defendant Ficco alone in the office. Plaintiff was not included in or informed of the substance of this discussion.

209. Plaintiff was terminated shortly thereafter, following the October 29, 2025, warning and the November 18, 2025, confrontation, and in close temporal proximity to Plaintiff's protected activity.

210. On November 18, 2025, Plaintiff sent an email to Defendants Pirutinsky and Ficco, copying Jeff, the union shop steward, seeking to address issues related to onboarding, union status, threats regarding nonpayment for work performed, and employment terms. Jeff did not respond to Plaintiff or contact him directly but instead communicated only with Defendant Pirutinsky regarding a proposed meeting. Plaintiff confirmed his attendance for the meeting the following day and copied additional union representatives; however, no union representative contacted Plaintiff prior to the meeting.

211. On November 19, 2025, prior to the scheduled meeting, Plaintiff observed multiple unfamiliar individuals in the building who were later identified as affiliated with Center Management Group. Approximately thirty minutes before the meeting, Defendant Pirutinsky circulated Plaintiff's previously prepared menus to personnel at another facility, including the Director of Dietary at The Plaza at Clover Lake, copying Plaintiff on the communication despite Plaintiff having no prior involvement with or connection to that facility. Plaintiff understood this communication, in the context of the surrounding events, to be inconsistent with his role and indicative of ongoing actions affecting his employment. Following Plaintiff's termination, Plaintiff learned that personnel affiliated with The Plaza at Clover Lake and related operations associated with Defendant Charles Gros had interacted with employees within Plaintiff's department, including employees with longstanding working relationships with Plaintiff. Plaintiff reasonably believed such conduct contributed to operational pressure, intimidation, and retaliatory atmosphere during the period immediately preceding Plaintiff's termination. Plaintiff further learned that shortly thereafter one employee resigned and another expressed discomfort concerning the interaction and presence of such personnel.

212.   Following his termination on November 19, 2025, Plaintiff submitted a formal written complaint to union leadership detailing retaliation, union interference, and failure-of-representation concerns. On November 20, 2025, the union responded in writing asserting that Plaintiff was not eligible for union membership and declining representation.

213.   Plaintiff had been treated as a union member throughout his employment, including enrollment in union benefits, deduction of union dues through November 2025, and participation in union-related programs. The shop steward, Defendant Jeff Elkins, personally enrolled Plaintiff and was aware of Plaintiff's role and duties. Despite this history, during the termination process Elkins stated for the first time that Plaintiff did not qualify for union membership because he was allegedly a "manager," and the union subsequently asserted Plaintiff was ineligible only after Plaintiff requested representation. At no point prior to termination did the union question Plaintiff's eligibility or provide Plaintiff an opportunity to challenge that determination.

214.   Upon information and belief, the union permitted selective and inconsistent advocacy among employees. Defendant Jeff Elkins, while acting as shop steward, advocated for and obtained a wage increase for himself and certain maintenance employees, while other union members, including Plaintiff, did not receive comparable advocacy during the same period.

215.   Plaintiff assisted another employee who sought union membership but was unable to obtain it despite repeated efforts over approximately one and a half years. After Plaintiff advised her to contact the union directly, she was confronted by Jeff in a hostile manner. Plaintiff possesses written communications reflecting these events.

216.   The union accepted Defendants' position regarding Plaintiff's employment, termination, union eligibility, and the applicability of the collective bargaining agreement without conducting a meaningful investigation, providing Plaintiff an opportunity to respond, or advocating on Plaintiff's behalf. The union further stated that union dues and annuity contributions would be refunded but failed to return those funds. Plaintiff reasonably believes these actions were

39

arbitrary, undertaken in bad faith, and deprived him of fair representation at a critical time in his employment.

## XX. POST-TERMINATION USE OF WORK PRODUCT

217. Plaintiff performed substantial work for Defendants, including the development of menus, operational systems, workflow structures, vendor relationships, and cost-control measures that directly supported the facility's day-to-day operations. These materials and systems were developed through Plaintiff's labor, expertise, and time during his employment.

218. Following Plaintiff's termination, Defendants continued utilizing Plaintiff's work product in ongoing operations and service delivery and, upon information and belief, derived continued operational and financial benefits therefrom, including cost savings and efficiency gains. Plaintiff reasonably believed Defendants continued utilizing his labor and work product while preparing for his removal from employment. Plaintiff was not fully compensated for the value of this work, including Defendants' continued use of such materials and systems after termination, and reasonably believes Defendants were unjustly enriched by retaining and benefiting from his labor without providing fair compensation.

## XXI. PATTERN OF CONDUCT

219. Defendants engaged in repeated unlawful and improper conduct affecting multiple aspects of Plaintiff's employment and the operation of the facility.

220. Defendants' conduct affected not only Plaintiff but also other employees and residents within the facility.

221. Such conduct included, but was not limited to, unlawful surveillance, retaliation, wage and onboarding violations, union-related misconduct, resident-care concerns, privacy violations, environmental hazards,

and operational practices Plaintiff reasonably believed were inconsistent with applicable legal and regulatory requirements.

222. Defendants failed to correct known issues despite repeated notice and instead continued such conduct, demonstrating a systemic pattern of disregard for legal, regulatory, and contractual obligations.

## XXII. CAUSES OF ACTION

223. Count I – Unlawful Workplace Surveillance

224. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

225. Defendants installed, maintained, and utilized surveillance devices, including concealed cameras, audio-capable recording devices, and biometric timekeeping systems, without proper notice, disclosure, or informed consent, and failed to adequately disclose the nature, scope, and extent of such monitoring and recording.

226. Defendants collected and utilized employee biometric data, including facial recognition, without providing required written policies or obtaining informed consent, in violation of applicable law, including NY Labor Law §203-c.

227. Defendants' use of surveillance extended beyond legitimate security purposes and was used to monitor employees, including Plaintiff, in a targeted and intrusive manner.

228. As a result of Defendants' unlawful surveillance practices, Plaintiff suffered damages.

229. Count II – Retaliation Under Federal and State Law

230. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

231. Plaintiff engaged in protected activity by reporting and objecting to conduct Plaintiff reasonably believed violated laws, regulations, and public-health and workplace-safety standards, including concerns involving surveillance

41

practices, wage issues, resident care, unsafe conditions, and operational misconduct.

232. Defendants were aware of Plaintiff's protected activity.

233. Following Plaintiff's complaints, Defendants subjected Plaintiff to adverse employment actions, including increased monitoring, reduction of authority, restriction of access to management, and termination.

234. The adverse actions taken against Plaintiff were causally connected to his protected activity, as demonstrated by temporal proximity and the escalating pattern of conduct described herein.

235. As a result, Plaintiff suffered damages.

236. Count III – Wage and Hour Violations

237. (Including unpaid overtime, off-the-clock work, spread-of-hours pay, late final wages, and unpaid earned wages).

238. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

239. Defendants failed to pay Plaintiff for all hours worked, including overtime hours in excess of forty per week.

240. Defendants required Plaintiff to perform off-the-clock work, including after-hours communications, off-premises work, and work performed outside scheduled shifts, without compensation.

241. Defendants failed to provide spread-of-hours compensation and failed to pay wages in a timely manner, including final wages upon termination.

242. Defendants' actions were willful and in violation of the Fair Labor Standards Act and New York Labor Law.

243. As a result, Plaintiff suffered damages.

244. Count IV – Wage Notice and Recordkeeping Violations

245. (Under NY Labor Law §195 and related wage notice/paystub laws).

246. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

42

247. Defendants failed to provide Plaintiff with an accurate written notice of rate of pay at the time of the November 2025 transition, as required by New York Labor Law §195(1).

248. During and following the November 2025 transition, Defendants failed to provide accurate wage statements reflecting hours worked, rates of pay, and employer identity, in violation of New York Labor Law §195(3).

249. Defendants maintained incomplete, inaccurate, inconsistent, and/or delayed payroll and employment records.

250. As a result of these violations, Plaintiff is entitled to statutory damages, penalties, and other relief under New York Labor Law.

251. Count V – Equitable Estoppel Concerning Union Eligibility , Benefit Status, and Representation.

252. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

253. Throughout Plaintiff's employment, Defendants represented that Plaintiff was eligible for union membership, union-related benefits, annuity participation, and employer-paid family health coverage.

254. Defendants memorialized such representations in Plaintiff's written Employment Agreement, which provided that Plaintiff would be offered membership in Local 713 IBOTU and would receive union-related benefits, including annuity contributions and employer-paid family health coverage.

255. Defendants treated Plaintiff as union eligible throughout the majority of his employment, including deducting union dues, enrolling Plaintiff in union-related benefit programs, and providing benefits associated with union participation.

256. Plaintiff reasonably relied upon Defendants' representations concerning union membership, benefit eligibility, health coverage, annuity participation, and related employment protections when accepting employment, continuing employment, and structuring his compensation arrangements.

257. Plaintiff further relied upon such representations by continuing to perform his duties and refraining from seeking alternative arrangements for compensation, health coverage, and employment-related benefits.

258. During the ownership transition and immediately prior to Plaintiff's termination, Defendants reversed their prior position and asserted that Plaintiff was not eligible for union membership, representation, and related benefits.

259. Defendants and the Union relied upon Plaintiff's alleged supervisory status to deny representation, challenge benefit eligibility, and dispute rights that had previously been recognized and provided throughout Plaintiff's employment.

260. Plaintiff reasonably relied upon Defendants' prior representations and suffered harm when Defendants subsequently adopted a position inconsistent with those representations.

261. As a result of Defendants' inconsistent conduct and representations, Plaintiff lost representation, benefits, protections, health-coverage rights, and other employment-related rights and suffered damages.

262. Defendants should be equitably estopped from denying Plaintiff's union eligibility, benefit participation, and related rights after representing, recognizing, and administering such rights throughout Plaintiff's employment.

263. Plaintiff is entitled to such equitable, declaratory, monetary, and other relief as the Court deems just and proper.

264. Count VI – Whistleblower Retaliation (NY Labor Law §740)

265. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

266. Plaintiff disclosed, reported, and objected to practices Plaintiff reasonably believed violated laws, rules, and regulations and posed substantial and specific dangers to public health, workplace safety, employee rights, and resident welfare.

267. Such disclosures and objections included concerns involving concealed workplace surveillance, audio-capable recording devices, biometric timekeeping systems, wage and onboarding violations, spread-of-hours and compensation issues, resident neglect and supervision concerns, medication-related practices involving non-clinical personnel, environmental and safety hazards, sanitation concerns, and the handling of sensitive resident medical and personal information.

268. Defendants were aware of Plaintiff's protected activity.

269. Following Plaintiff's protected activity, Defendants subjected Plaintiff to increasing scrutiny, monitoring, interference with his authority, bypassing of his supervisory role, restrictions on operational decision-making, intimidation regarding workplace complaints, and ultimately termination.

270. The retaliatory actions were causally connected to Plaintiff's protected activity, as demonstrated by the timing of Plaintiff's complaints, the progressive reduction of his authority following those complaints, the October 29, 2025 warning concerning workplace and operational issues, the November 18, 2025 confrontation regarding his employment and union status, and his termination on November 19, 2025.

271. Defendants' conduct violated New York Labor Law §740.

272. As a result, Plaintiff suffered damages.

273. Count VII – Breach of Duty of Fair Representation

274. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

275. Defendant Local 713 IBOTU, UMD, ILA, owed Plaintiff a duty of fair representation.

276. The union acted arbitrarily, discriminatorily, and in bad faith by failing to investigate Plaintiff's complaints, failing to process or pursue a grievance, and failing to advocate on Plaintiff's behalf.

277. The union failed to respond to Plaintiff's communications and failed to provide a meaningful opportunity to challenge his termination.

278. The union denied representation only after Plaintiff invoked union protections and requested assistance.

279. The union adopted Defendants' position without conducting an independent investigation, including accepting the claim that the new management company was not bound by the collective bargaining agreement.

280. The union failed to investigate or challenge whether Defendants operated as a successor employer despite substantial continuity in workforce, operations, and management.

45

281. In a written communication dated November 20, 2025, the union stated that it would not represent Plaintiff.

282. In that same communication, the union asserted for the first time that Plaintiff was not eligible for union membership, despite previously accepting union dues, enrolling Plaintiff in union benefits, treating Plaintiff as a member throughout his employment, and providing union-related benefits as part of Plaintiff's compensation arrangement. Prior to the transition and termination period, neither the union nor Defendants had challenged Plaintiff's union eligibility.

283. The union acknowledged that union dues and annuity contributions had been collected on Plaintiff's behalf and would be refunded.

284. The conduct of the union and its agent, including Defendant Jeff Elkins, reflected alignment with management interests rather than independent representation of Plaintiff's interests, including the failure to investigate Plaintiff's complaints, the acceptance of Defendants' position regarding Plaintiff's eligibility and termination without independent inquiry, and the refusal to provide representation after Plaintiff requested union assistance.

285. The union's actions were arbitrary, discriminatory, and in bad faith.

286. As a result, Plaintiff was deprived of fair representation and suffered damages.

287. Count VIII – Joint Employer Liability

288. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

289. Defendants operated as joint employers with respect to Plaintiff's employment and shared authority over hiring, firing, supervision, scheduling, payroll, onboarding, labor relations, and day-to-day operations.

290. Although Plaintiff was originally hired by Defendant Patrice Ficco, authority over Plaintiff's employment was increasingly exercised by personnel associated with Center Management Group and related entities during the transition period, including Defendant Meira Pirutinsky, who exercised authority over payroll, onboarding, scheduling, operational decisions, and ultimately Plaintiff's termination.

291. Defendants shared and exercised control over Plaintiff's work through overlapping management personnel and operational structures. Plaintiff received directives, operational instructions, scheduling-related requests, staffing-related directives, onboarding-related communications, and transition-related communications from personnel associated with Esplanade Staten Island, Center Management Group, and Catholic Health Group, including Defendant Patrice Ficco, Defendant Meira Pirutinsky, Defendant Charles Gros, Ari Colman, Daniel Allen, and Rachel Horowitz.

292. Defendants exercised centralized control over labor relations and employment decisions affecting Plaintiff, including onboarding, payroll administration, scheduling approval, staffing decisions, operational authority, employment classification, union-related matters, benefit-related matters, and termination decisions.

293. Plaintiff's authority was subject to review, restriction, and override by personnel associated with multiple entities. Plaintiff was required to submit scheduling and operational information for review and approval by upper management, including Defendant Meira Pirutinsky, received directives from personnel affiliated with different entities, and observed overlapping involvement in payroll, onboarding, staffing, operational management, and employment-related decisions.

294. Defendants operated through overlapping management structures, shared personnel, interrelated operational practices, and coordinated decision-making affecting Plaintiff's employment, demonstrating substantial joint control over the terms and conditions of Plaintiff's employment.

295. Count IX – Successor Employer Liability

296. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

297. Defendants operated as successor employers with respect to Plaintiff's employment.

298. The November 2025 transition did not result in any meaningful change in business operations.

299. The same facility, location, services, and core business operations continued without interruption.

300. A substantial majority of the workforce, estimated at no less than approximately 85 percent and likely higher, remained employed before and after the transition.

301. Management personnel and decision-makers remained the same or substantially similar following the transition. Plaintiff observed that management personnel, department heads, supervisors, employees, residents, operations, and services remained substantially unchanged, with Plaintiff being one of the few management employees who did not remain employed.

302. Plaintiff's core operational duties continued during the transition period despite substantial reductions in Plaintiff's authority and managerial discretion.

303. Defendants required Plaintiff and other employees to continue working while simultaneously onboarding into a new system without a formal termination or rehiring process. Plaintiff was not provided a written offer of employment, rate-of-pay notice, or clear explanation of employment status before continuing work during the transition. Following Plaintiff's termination, employees and residents were informed that Plaintiff had voluntarily left employment or failed to accept an offer, despite Plaintiff's position that no employment offer was ever provided.

304. Defendants failed to clearly identify the employing entity during the transition, creating confusion while maintaining operational control over employees.

305. Upon information and belief, the transition was structured to avoid liability while maintaining continuity of operations.

306. As a result, Defendants are liable as successor employers for the unlawful acts described herein.

307. Count X – Improper Disclosure and Inadequate Safeguarding of Medical, Financial, and Personal Information

48

308. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

309. Defendants failed to implement adequate safeguards, controls, policies, and procedures to protect sensitive medical, financial, and personal information from unauthorized access, disclosure, transmission, misuse, and dissemination.

310. Defendants permitted sensitive information, including medical documentation, medical cards, Social Security information, trust-related records, financial records, and other confidential medical, financial, personal, and resident information, to be accessed, transmitted, and shared through internal communications and workplace systems without adequate safeguards or limitations on access.

311. Plaintiff received and observed such sensitive information being transmitted through workplace communications and raised concerns regarding the handling, transmission, access, and disclosure of such information.

312. Defendants failed to take corrective action and continued permitting the transmission and sharing of sensitive medical, financial, and personal information in a manner Plaintiff reasonably believed lacked adequate privacy and data-protection safeguards.

313. As a result of Defendants' conduct, sensitive medical, financial, and personal information was exposed to an unreasonable risk of unauthorized access, disclosure, misuse, and dissemination.

314. Defendants' conduct was willful, intentional, and/or in reckless disregard of privacy and confidentiality interests associated with such information.

315. Count XI – Unjust Enrichment

316. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

317. Plaintiff performed substantial work for Defendants, including developing menus, operational systems, workflow structures, vendor

49

relationships, and cost-control measures that directly supported Defendants' business operations.

318. A portion of this work was performed outside regular working hours and off-site, including from Plaintiff's home, without full compensation.

319. Defendants accepted, retained, and benefited from Plaintiff's work, including the continued use and implementation of such materials and systems after Plaintiff's termination.

320. Upon information and belief, Defendants derived financial and operational benefits from Plaintiff's work, including cost savings, efficiency gains, and continued business operations.

321. Plaintiff was not fully compensated for this work, including uncompensated off-site labor, and Defendants continued to use and benefit from Plaintiff's work product following termination.

322. Under principles of equity and good conscience, Defendants should not be permitted to retain and benefit from Plaintiff's labor without providing fair compensation.

323. As a result, Plaintiff is entitled to restitution and disgorgement of the benefits unjustly retained by Defendants.

324. Count XII – Failure to Provide Required Termination Documentation and Benefits Information.

325. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

326. Defendants were required to provide Plaintiff with accurate and timely post-termination wage, employment, and benefits-related documentation and notices.

327. Defendants failed to provide Plaintiff with a letter of termination despite representing that such documentation would be issued.

328. Defendants further failed to provide clear and complete information regarding Plaintiff's final wages, compensation owed, pay calculations, payroll records, and the basis for amounts paid and unpaid following termination. Plaintiff further observed irregularities in the final payroll records,

50

including wages for multiple payroll periods being combined into a single paycheck, the omission of overtime compensation Plaintiff believed was owed, and payroll records reflecting pay periods extending beyond Plaintiff's termination date.

329. Defendants failed to provide timely and accurate information regarding Plaintiff's benefits, including health insurance coverage, continuation rights, benefit eligibility, union-related benefits, replacement benefit arrangements following the transition, and the status and termination of Plaintiff's coverage.

330. As a result of Defendants' failures, Plaintiff experienced confusion, delay, and disruption concerning wages, payroll records, health coverage, benefits, employment status, and post-termination rights.

331. Plaintiff suffered damages as a result, including financial harm, loss of benefits, and out-of-pocket expenses.

332. Defendants' conduct was willful, negligent, and in disregard of their obligations to provide required post-termination documentation and information.

333. Count XIII – ERISA Violations (Failure to Provide Plan Documents and Records)

334. Under 29 U.S.C. § 1024(b)(4) and § 1132(c)

335. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

336. Plaintiff submitted written requests for plan documents and records relating to his participation, contributions, benefits, hours reported, employer reporting, job classifications, and union-related benefit records on or about February 11, 2026, and March 10, 2026.

337. The requested documents included, but were not limited to, Summary Plan Descriptions, plan documents, summary annual reports, contribution histories, vested-balance information, vesting schedules, employer contribution reports, hours-reported records, job-classification records, dues-remittance records, and other records concerning Plaintiff's participation in union-related benefit plans.

338. Defendants failed to provide the requested documents within the time required by law and failed to respond to Plaintiff's requests. Although certain annuity-related paperwork and a dues-refund check were later transmitted, Defendants did not provide the records and information requested by Plaintiff and have not produced such records to date.

339. As a result of Defendants' failure to comply, Plaintiff has been unable to verify his benefits, contributions, hours reported, employer reporting, job classifications, eligibility status, and rights under the plan.

340. Defendants' failure to provide the requested documents was willful and in violation of ERISA.

341. Pursuant to 29 U.S.C. § 1132(c), Plaintiff is entitled to statutory penalties and any other relief deemed appropriate by the Court.

342. Count XIV – Breach of Contract

343. Plaintiff entered into a written Employment Agreement with Defendants in or about October 2023. Prior to execution of the agreement, Plaintiff negotiated employment terms with Defendant Patrice Ficco, who represented that she was acting on behalf of ownership, including Defendants Alexander "Ali" Scharf and Aaron Bokchin.

344. Defendant Patrice Ficco participated directly in negotiating, drafting, presenting, executing, and implementing the Employment Agreement and compensation arrangement. Defendant Ficco transmitted the Employment Agreement to Plaintiff, executed the agreement on behalf of Defendants, and served as Plaintiff's primary management representative concerning the terms of employment, compensation, benefits, and union-related matters.

345. The Employment Agreement provided, among other things, that Plaintiff would receive annual compensation, that compensation would be revisited and reviewed after a three-month period, and that Plaintiff would be offered membership in Local 713 IBOTU, including union-related benefits consisting of Local 713 Annuity Fund contributions and employer-paid family health coverage. Plaintiff specifically sought employer-paid family health coverage as part of his compensation arrangement, and Defendant Ficco

structured and presented the Employment Agreement in a manner that included union membership and union-related benefits as the mechanism through which such coverage and benefits would be provided.

346. Plaintiff performed his obligations under the Employment Agreement and remained employed by Defendants pursuant to its terms.

347. Defendants failed to conduct the agreed-upon three-month compensation review and subsequently attempted to alter, deny, and/or repudiate contractual provisions concerning Plaintiff's union membership, benefits, health coverage, compensation structure, and employment terms.

348. During the November 2025 transition period, Plaintiff repeatedly requested written clarification concerning compensation, health coverage, union status, benefits, and employment terms and advised Defendants that he would not agree to modifications of his contractual rights unless such changes were provided in writing.

349. Plaintiff never signed any written amendment, modification, waiver, or agreement relinquishing rights concerning union membership, annuity participation, employer-paid family health coverage, compensation, or other material terms of the Employment Agreement.

350. Defendants' conduct constituted a breach of the Employment Agreement.

351. As a direct and proximate result of Defendants' breach, Plaintiff suffered damages, including loss of contractual benefits, loss of health coverage, loss of union-related benefits, economic damages, out-of-pocket expenses, and other consequential losses.

352. Count XV – Retaliation in Violation of New York Labor Law §215

353. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

354. Plaintiff engaged in protected activity under New York Labor Law by making complaints concerning wages, overtime compensation, spread-of-hours compensation, payroll practices, employee compensation, payroll discrepancies, and onboarding-related issues affecting employee pay.

355. Plaintiff raised wage-related complaints throughout his employment, including complaints concerning overtime worked, employee compensation, spread-of-hours pay, payroll calculations, and compensation practices affecting employees.

356. In or about October and November 2025, Plaintiff raised concerns to Defendants Patrice Ficco and Meira Pirutinsky regarding employee compensation, spread-of-hours pay, payroll calculations, break-deduction practices, and wage-related issues affecting employees.

357. Plaintiff additionally raised concerns that onboarding deficiencies could interfere with employees receiving wages accurately and in a timely manner.

358. Defendants were aware of Plaintiff's wage-related complaints and protected activity.

359. Following Plaintiff's wage-related complaints, Plaintiff experienced increasing hostility, scrutiny, interference with his authority, operational restrictions, and adverse treatment.

360. Within close temporal proximity to Plaintiff's wage-related complaints and protected activity, Defendants terminated Plaintiff's employment.

361. Defendants' actions were motivated, in whole or in part, by Plaintiff's protected complaints concerning wages, compensation, payroll practices, and employee pay.

362. Defendants' conduct violated New York Labor Law §215.

363. As a direct and proximate result of Defendants' unlawful retaliation, Plaintiff suffered damages.

364. Plaintiff is entitled to all relief available under New York Labor Law §215, including damages, statutory relief, equitable relief, costs, attorneys' fees where authorized, and such other relief as the Court deems just and proper.

365. Count XVI – ERISA §510 Interference With Protected Benefit Rights (29 U.S.C. § 1140)

366. Plaintiff repeats and realleges all prior paragraphs as if fully set forth herein.

54

367. Plaintiff participated in and sought to preserve rights relating to employee benefit plans, including union-related benefits, Local 713 Annuity Fund participation, and employer-provided family health coverage.

368. Plaintiff's Employment Agreement provided for union-related benefits, including participation in Local 713 and associated benefit programs. Plaintiff specifically sought employer-paid family health coverage as part of his compensation arrangement.

369. Prior to October 2025, Defendants treated Plaintiff as eligible for union membership and benefits, collected union dues, enrolled Plaintiff in union-related benefit programs, and did not challenge Plaintiff's eligibility for such benefits.

370. On or about October 23, 2025, Defendant Aaron Bokchin asked Plaintiff whether he would leave the union if he received substantially the same compensation and benefits outside the union.

371. On or about October 24, 2025, Defendant Patrice Ficco informed Plaintiff that he "technically" did not qualify for union membership despite Defendants' prior treatment of Plaintiff as union eligible and despite the terms of Plaintiff's Employment Agreement.

372. During the November 2025 transition period, Plaintiff repeatedly requested written clarification regarding compensation, health coverage, union status, benefits, and employment terms.

373. On or about November 18, 2025, Defendant Meira Pirutinsky requested that Plaintiff confirm he was no longer enrolled in the union and asserted that supervisors were not eligible for union membership.

374. Plaintiff responded that he remained a union member, that his Employment Agreement expressly included union membership and union-related benefits, that he would complete required payroll documentation, and that he would not agree to changes affecting his contractual rights, union status, benefits, health coverage, compensation, or employment terms unless such changes were provided in writing.

375. Defendants did not meaningfully respond to Plaintiff's assertions concerning his contractual rights, union status, benefit rights, or health coverage.

376. Shortly thereafter, Plaintiff was subjected to additional pressure concerning onboarding, union status, and employment classification, and was terminated on November 19, 2025.

377. Upon information and belief, Defendants interfered with, restrained, and/or retaliated against Plaintiff for exercising and attempting to preserve rights relating to employee benefit plans and benefit participation.

378. Defendants' conduct violated ERISA §510, 29 U.S.C. §1140.

379. As a direct and proximate result of Defendants' conduct, Plaintiff suffered damages, including loss of health coverage, loss of benefit-related rights, loss of union-related benefits, economic harm, and other damages.

380. Plaintiff is entitled to all relief available under ERISA, including equitable relief, restoration of benefits, statutory relief, costs, attorneys' fees where authorized, and such other relief as the Court deems just and proper.

## XXIII. DAMAGES

381. Plaintiff suffered damages as a direct result of Defendants' unlawful conduct, including back pay, front pay, lost wages, unpaid compensation, loss of benefits, loss of union-related contributions, loss of annuity and retirement-related contributions, and other economic harm arising from retaliation, termination, and related employment actions.

382. Plaintiff has been unable to verify contributions, benefits, account status, hours reported, employer reporting, eligibility status, and other plan-related information due to Defendants' failure to provide requested records.

383. As a direct result of Plaintiff's termination and Defendants' failures concerning employment records, benefits information, onboarding-related benefit disclosures, and post-termination obligations, Plaintiff lost employer-provided health coverage for himself and his family, including coverage affecting Plaintiff's dependent disabled child. Plaintiff consequently incurred out-of-pocket

56

medical expenses and experienced delays and disruptions in obtaining necessary medical care and treatment for family members.

384. Plaintiff received COBRA-related documentation through the union; however, Defendants' failure to provide clear and timely post-termination information caused confusion, delay, and disruption concerning Plaintiff's ability to understand and exercise benefits-related rights.

385. Plaintiff incurred tax liability, accounting-related expenses, and financial harm arising from improper wage reporting, including the issuance of Form 1099-NEC for non-compensatory reimbursements.

386. Plaintiff has experienced difficulty obtaining comparable employment following termination. Plaintiff previously maintained multiple income sources, including secondary employment, and has suffered ongoing economic harm, reduced earning capacity, loss of future employment opportunities, and loss of career advancement opportunities following Defendants' actions and termination-related events.

387. Plaintiff further suffered physical harm when concerns arising from the concealed locker-room camera and the resulting workplace conflict, scrutiny, and retaliation caused Plaintiff to curtail a previously approved medical leave and return to work before his recovery was complete. As a result, Plaintiff's shoulder did not receive adequate time to heal, causing additional pain, discomfort, and physical limitations.

388. Plaintiff suffered emotional distress, reputational harm, and other non-economic damages as a result of Defendants' conduct, including the retaliatory actions taken against Plaintiff following his protected activity and whistleblower disclosures, which caused stress, anxiety, and disruption to Plaintiff's professional standing and personal life.

389. Plaintiff continues to suffer damages, including ongoing and future financial, professional, economic, consequential, and personal harm.

390. Plaintiff reserves the right to supplement and amend claims relating to damages based upon future medical evaluation, expert review,

discovery, benefit-plan records, payroll records, tax records, and additional information obtained during litigation.

391. Plaintiff is entitled to back pay, front pay, liquidated damages, statutory penalties, punitive damages where permitted, prejudgment interest, tax gross-up relief, attorneys' fees, costs, disbursements, and all other relief available under applicable federal, state, and local laws, including enhanced damages based on Defendants' willful and knowing conduct.

## XXIV. JURY DEMAND

392. Plaintiff demands a trial by jury on all issues so triable.

## XXV. PRAYER FOR RELIEF

393. Plaintiff seeks all relief available under applicable law, including compensatory damages, back pay, front pay, statutory damages, liquidated damages, punitive damages where permitted, prejudgment interest, tax gross-up relief, equitable relief where appropriate, costs, disbursements, attorneys' fees where authorized, and such other relief as the Court deems just and proper.

SIGNATURE

Dated: 06/01/2026   6\3\2026

Joseph Franqui
Plaintiff Pro Se
262 Maybury Avenue
Staten Island, New York 10308

347-854-8098

JosephFranqui26@outlook.com