*** Filed ***
11:25 PM, 09 Jul, 2026
U.S.D.C., Eastern District of New York

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                         Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a
ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**PLAINTIFF'S NOTICE OF MOTION FOR LEAVE TO FILE SECOND AMENDED
COMPLAINT**


PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law in Support of this

Motion, the Proposed Second Amended Complaint attached as Exhibit A, and all prior

1

proceedings herein, Plaintiff Joseph Franqui, appearing pro se, respectfully moves this Court, pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, for an Order:

    A.  Granting Plaintiff leave to file the attached Proposed Second Amended Complaint;

    B.  Directing that the Proposed Second Amended Complaint attached as Exhibit A be deemed the operative pleading upon entry of the Court's Order; and

    C.  Granting such other and further relief as the Court deems just and proper.

This motion is made pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, which provides that leave to amend should be freely given when justice so requires.

The proposed amendment is sought before service of process upon any Defendant. No Defendant has been served, no Defendant has appeared, no responsive pleading has been filed, and no scheduling order has been entered.

Plaintiff has diligently attempted to obtain legal counsel while maintaining his remaining employment and actively seeking comparable replacement employment following the termination of his employment with Defendants. During that time, Plaintiff has continued reviewing the pleadings and evidence to streamline the case before service.

The Proposed Second Amended Complaint removes certain previously named Defendants, eliminates duplicative allegations, reorganizes and clarifies Plaintiff's factual allegations and legal claims, incorporates limited additional factual allegations identified during Plaintiff's continued review of the facts and evidence, and streamlines the pleading before service.

Granting this Motion at this early stage will promote judicial economy, avoid unnecessary service of a superseded pleading, and will not prejudice any party.


Dated:    July 09    , 2026

Staten Island, New York

Respectfully submitted,


/s/ Joseph Franqui

2

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                      Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a
ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a
ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO
FILE SECOND AMENDED COMPLAINT**


**PRELIMINARY STATEMENT**


1

Plaintiff Joseph Franqui respectfully submits this Memorandum of Law in support of his Motion for Leave to File the attached Proposed Second Amended Complaint pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure.

Plaintiff seeks leave to amend before any Defendant has been served, before any Defendant has appeared, before any responsive pleading has been filed, and before any scheduling order has been entered. The proposed amendment removes certain previously named Defendants, eliminates duplicative allegations, reorganizes and clarifies the factual allegations and legal claims, incorporates limited additional factual allegations identified during Plaintiff's continued review of the facts and evidence, and streamlines the pleading before service.

Because this action remains at its earliest procedural stage, granting leave will promote judicial economy, avoid unnecessary expense associated with serving a pleading that Plaintiff seeks to amend before service, and will not prejudice any Defendant.

**BACKGROUND**

This action remains at its earliest procedural stage. No Defendant has been served, no Defendant has appeared, no responsive pleading has been filed, and no scheduling order has been entered.

Since commencing this action, Plaintiff has diligently reviewed the pleadings and evidence, continued refining the proposed complaint, and diligently attempted to retain legal counsel. During that same period, Plaintiff has maintained his remaining employment while actively seeking comparable replacement employment following the termination of his employment with Defendants.

2

As a result of Plaintiff's continued review, the Proposed Second Amended Complaint removes certain Defendants, eliminates duplicative allegations, reorganizes portions of the pleading for clarity, and incorporates limited additional factual allegations. Plaintiff seeks leave to amend before service so that Defendants will be served only with the operative pleading.

**LEGAL STANDARD**

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party may amend its pleading only with the Court's leave and that "[t]he court should freely give leave when justice so requires."

The Supreme Court has explained that leave to amend should ordinarily be granted absent undue delay, bad faith, repeated failure to cure deficiencies, undue prejudice to the opposing party, or futility. Foman v. Davis, 371 U.S. 178, 182 (1962).

**ARGUMENT**

Plaintiff respectfully requests leave to file the Proposed Second Amended Complaint pursuant to Rule 15(a)(2).

This motion is made before service of process, before any Defendant has appeared, before any responsive pleading has been filed, and before any scheduling order has been entered. Accordingly, no Defendant will be prejudiced if leave to amend is granted. Plaintiff has diligently reviewed the pleadings and evidence, attempted to retain legal counsel, maintained his remaining employment, and actively sought comparable replacement employment following the termination of his employment with Defendants. During that review, Plaintiff determined that the proposed amendment would streamline the pleadings by removing certain previously named Defendants, eliminating duplicative

3

allegations, reorganizing portions of the complaint, and incorporating limited additional factual allegations before service.

Granting leave at this stage will permit the action to proceed upon a single operative complaint, avoid unnecessary expense associated with serving a pleading that Plaintiff seeks to amend before service, conserve the resources of the Court and the parties, and promote the efficient administration of this action.

Under Rule 15(a)(2), leave to amend should be freely given when justice so requires. Because this action remains at its earliest procedural stage and no party will be prejudiced, Plaintiff respectfully requests that the Court grant the motion.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Leave to File the Proposed Second Amended Complaint and grant such other and further relief as the Court deems just and proper.

Dated:____July 09___, 2026
Staten Island, New York
Respectfully submitted,

/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR LEAVE TO FILE
SECOND AMENDED COMPLAINT**

1

Upon Plaintiff Joseph Franqui's Motion for Leave to File a Second Amended Complaint, the accompanying Memorandum of Law, the Proposed Second Amended Complaint attached as Exhibit A, and all papers submitted in support thereof, and good cause appearing, it is hereby

ORDERED, that Plaintiff's Motion for Leave to File a Second Amended Complaint is GRANTED; and it is further

ORDERED, that the Proposed Second Amended Complaint attached as Exhibit A shall be deemed filed as of the date of this Order; and it is further

ORDERED, that Plaintiff shall serve the Second Amended Complaint upon Defendants in accordance with the Federal Rules of Civil Procedure and any further Orders of this Court.

SO ORDERED.


Dated: _____

Brooklyn, New York




_____

HON. DIANE GUJARATI

United States District Judge

2

# EXHIBIT A

# PROPOSED SECOND AMENDED COMPLAINT

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK


JOSEPH FRANQUI,

Plaintiff,                                    Case No. 1:26-cv-02867-DG-RML

-against-                                     JURY TRIAL DEMANDED

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


SECOND AMENDED COMPLAINT


## I. INTRODUCTION


1.      Plaintiff Joseph Franqui brings this action arising from Defendants'
alleged retaliation after Plaintiff repeatedly reported workplace misconduct,
including wage-and-hour violations, unlawful workplace surveillance, employee

2

safety concerns, resident neglect, environmental and sanitation concerns, onboarding deficiencies, privacy concerns, union-related issues, and other matters affecting employees and facility operations. Rather than investigate or correct those concerns, Defendants progressively reduced Plaintiff's authority, increased scrutiny of his work, challenged his employment status and union rights during the November 2025 ownership transition, and ultimately terminated his employment.

2.      Plaintiff first worked with Defendants as a consultant before being recruited as Food Service Director. Throughout his employment, Plaintiff performed substantial operational responsibilities beyond his assigned position and repeatedly sought written clarification concerning his employment terms during the November 2025 ownership transition. Plaintiff alleges Defendants failed to provide those clarifications while continuing to require him to perform his duties and ultimately terminating his employment.

3.      Plaintiff further alleges that Defendant Local 713 IBOTU, UMD, ILA breached its duty of fair representation. Although the Union accepted Plaintiff as a member, collected union dues, participated in administering union-related benefits, and treated Plaintiff as a bargaining-unit employee throughout his employment, it declined to advocate on his behalf after he requested representation and instead adopted Defendants' position that Plaintiff was ineligible for union membership without conducting a meaningful independent investigation.

4.      Plaintiff further alleges that the actions described in this Complaint were undertaken by multiple corporate entities and individuals exercising overlapping authority during the Plaintiff's employment. Plaintiff alleges that the full nature of those relationships, including issues relating to joint employment, successor liability, centralized control, and coordinated decision-making, will be established through discovery.

## II. JURISDICTION AND VENUE

3

5.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States. Plaintiff asserts claims arising under, among other federal laws, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq.; the Employee Retirement Income Security Act of 1974 ("ERISA"), including 29 U.S.C. §§ 1132 and 1140; and federal labor law, including Plaintiff's claim against Defendant Local 713 IBOTU, UMD, ILA for breach of the duty of fair representation. The Court has supplemental jurisdiction over Plaintiff's related New York State law claims pursuant to 28 U.S.C. § 1367 because those claims arise from the same nucleus of operative facts.

6.      Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred within this District, including Plaintiff's employment, the alleged retaliatory conduct, the ownership transition, the events surrounding Plaintiff's termination, and other acts and omissions alleged in this Complaint.

## III. PARTIES

### A. Plaintiff

7.      Plaintiff Joseph Franqui was employed by one or more Defendants at Esplanade Senior Residence, located at 1415 Richmond Avenue, Staten Island, NY 10314.

### B. Corporate Defendants

8.      Defendant Esplanade Staten Island LLC owned and operated Esplanade Senior Residence during a substantial portion of Plaintiff's employment and acted as Plaintiff's employer.

4

9.      Defendant Center Management Group LLC exercised centralized authority over Plaintiff's prior employer and Plaintiff's employment before and during the November 2025 operational transition, including authority over staffing, onboarding, payroll administration, scheduling, labor relations, employee classifications, compensation, discipline, and other employment matters.

10.     Defendant Richmond 26 Operating LLC d/b/a Esplanade Staten Island became Plaintiff's employer during the November 2025 transition and assumed responsibility for payroll, onboarding, and employment administration.

11.     Defendant Woodmere Operating Company LLC d/b/a Esplanade of Woodmere is affiliated with one or more Defendants through common ownership, management, and operational functions. Woodmere also issued the reimbursement payments and Form 1099-NEC described in this Complaint.

12.     Defendant Meridian Senior Living, LLC participated in administrative and operational functions relating to Woodmere Operating Company LLC. Plaintiff completed vendor documents bearing Meridian's name and communicated with Defendant Hindel Jesselson through a Meridian email account concerning reimbursement matters. The precise legal and operational relationship between Meridian Senior Living and Woodmere Operating Company LLC is presently unknown to Plaintiff and is expected to be established through discovery.

**C. Union Defendant**

13.     Defendant Local 713 IBOTU, UMD, ILA is a labor organization that represented, or purported to represent, employees at Esplanade Staten Island, including Plaintiff. Plaintiff alleges Local 713 breached its duty of fair representation by denying him representation and otherwise engaging in the conduct alleged herein.

**D. Individual Defendants**

5

14. Defendant Patrice Ficco served as Executive Director of Esplanade Staten Island and exercised supervisory authority over Plaintiff. She participated in Plaintiff's hiring, employment decisions, compensation, union-related issues, and the events surrounding Plaintiff's termination.

15. Defendant Charles-Edouard Gros is the C.E.O. of Defendant Center Management Group. He exercised substantial operational authority during the ownership transition and personally participated in matters affecting Plaintiff's employment, including employment-related meetings, operational decision-making, and the events immediately preceding Plaintiff's termination.

16. Defendant Meira Pirutinsky served as Vice President of Defendant Center Management Group LLC and exercised supervisory and operational authority over Plaintiff's employment. According to Defendants Charles-Edouard Gros and Patrice Ficco, all significant employment decisions required Defendant Pirutinsky's approval. Defendant Pirutinsky participated in the events giving rise to this action and terminated Plaintiff's employment on November 19, 2025.

17. Defendant Jeff Elkins served in the dual roles of Head of Security and shop steward for Local 713 IBOTU, UMD, ILA. Plaintiff alleges that Defendant Elkins exercised authority over workplace surveillance systems and union-related matters, participated in matters relating to Plaintiff's workplace complaints, surveillance, union representation, and termination, and otherwise participated in the acts and omissions alleged herein.

18. Defendant Aaron Bokchin exercised ownership and operational authority over Esplanade Staten Island and, by his own representations to Plaintiff, also held an ownership interest in Esplanade of Woodmere. Defendant Bokchin participated in Plaintiff's recruitment and hiring, discussions concerning Plaintiff's Employment Agreement, employment-related decisions, union-related matters, and the events giving rise to this action. Plaintiff further alleges that Defendant Bokchin directed Plaintiff to perform work relating to Esplanade of Woodmere, including matters that resulted in the reimbursement transactions and Form 1099-NEC described elsewhere in this Complaint.

6

19.     Defendant Alexander "Ali" Scharf exercised ownership and operational authority over Esplanade Staten Island and Esplanade of Woodmere. Based upon Plaintiff's observations, he also held greater decision-making authority than Defendant Aaron Bokchin with respect to ownership and employment matters. Together with Defendant Bokchin, Defendant Scharf participated in Plaintiff's recruitment, hiring, and the establishment of the terms of Plaintiff's Employment Agreement, and otherwise participated in the acts and omissions alleged throughout this Complaint.

20.     Defendant Hindel Jesselson served as Executive Director of Defendant Woodmere Operating Company LLC d/b/a Esplanade of Woodmere and exercised operational and managerial authority relating to the matters alleged herein. Defendant Jesselson communicated directly with Plaintiff concerning Woodmere operations and reimbursement matters. Plaintiff further alleges that Defendant Jesselson participated in, approved, directed, ratified, or knowingly permitted the reimbursement and reporting practices that resulted in the Form 1099-NEC described elsewhere in this Complaint.

21.     Defendants DOES 1-50 are individuals and/or entities whose identities are presently unknown to Plaintiff but who participated in, directed, authorized, supervised, ratified, or were otherwise responsible for the acts and omissions alleged herein. Plaintiff is informed and believes that such individuals and entities participated in the management, ownership, supervision, payroll administration, labor relations, onboarding, surveillance, benefits administration, operational control, and/or employment decisions affecting Plaintiff. Plaintiff will amend this Complaint to identify such defendants as their identities become known through discovery.

## IV. Corporate Relationships and Operational Control

7

22.     During Plaintiff's employment and the November 2025 operational transition, Center Management Group, Richmond 26 Operating LLC, and their management personnel exercised centralized control over staffing, onboarding, payroll administration, scheduling, compensation, labor relations, discipline, and Plaintiff's termination, while the identity of Plaintiff's employer became increasingly obscured. Plaintiff received directives from personnel associated with multiple corporate Defendants and reasonably believed his employment was centrally managed rather than controlled by a single entity.

23.     The November 2025 ownership transition occurred without a meaningful interruption of operations. The facility remained open, served the same residents from the same location, retained substantially the same workforce, including Plaintiff, and continued providing substantially the same services despite changes in payroll administration, onboarding, employer identification, and management structure.

24.     Plaintiff witnessed coordination among personnel associated with Defendants and with non-party entities, including Catholic Health Group, The Plaza at Clover Lake, Bensonhurst Center for Rehabilitation and Healthcare, and StaffLion. Those observations included shared personnel, operational directives, scheduling coordination, transition planning, and the transfer of Plaintiff's work product before and immediately after Plaintiff's termination. Plaintiff alleges these relationships are relevant to issues including centralized control, joint employment, successor liability, integrated enterprise, alter-ego liability, and coordinated decision-making, the full extent of which is expected to be established through discovery.

25.     Plaintiff further alleges that professional relationships exist between individuals associated with StaffLion and Defendant Center Management Group, including executive personnel who previously held leadership positions with Center Management Group before joining StaffLion. Plaintiff alleges these relationships are consistent with the coordinated operational transition, centralized management, and integrated employment practices described throughout this Complaint.

8

26.     Based upon the foregoing allegations, Plaintiff alleges that Defendants operated as an integrated enterprise, joint employers, successor employers, and/or alter egos.

## V. ADMINISTRATIVE PROCEDURES AND RELATED FILINGS

27.     Plaintiff filed administrative charges with the National Labor Relations Board ("NLRB") concerning employer retaliation and separate union representation and interference matters arising from the events alleged herein.

28.     Certain administrative proceedings relating to the matters alleged herein remain pending or under review.

## VI. FACTUAL ALLEGATIONS CONCERNING PLAINTIFF'S EMPLOYMENT, PROTECTED ACTIVITY, AND TERMINATION

### A.  Employment Background

29.     Plaintiff previously worked with Defendants in a consulting capacity prior to formal employment and assisted with operational systems, menus, procedures, and dietary-related operations involving the facility.

30.     Plaintiff formally began employment at Esplanade Staten Island on or about October 1, 2023, serving as Food Service Director / Executive Chef.

31.     In or about October 2023, Plaintiff entered into a written Employment Agreement with Defendants.

32.     Prior to entering into the written agreement, Defendants, through Defendant Patrice Ficco, offered to employ Plaintiff on an off-the-books basis on behalf of Esplanade, which Plaintiff declined in favor of lawful employment. Defendants had engaged in similar off-the-books employment arrangements with a prior Food Service Director.

33.     Following Defendant Scharf's approval of Plaintiff's employment arrangement, Defendant Patrice Ficco participated directly in preparing,

9

finalizing, and implementing Plaintiff's Employment Agreement and compensation arrangement. During those discussions, Defendant Ficco advised Plaintiff that she wanted all agreed employment terms incorporated into the written agreement.

34.    During those negotiations, Plaintiff requested that the agreement include a compensation review approximately three months after the commencement of his employment because certain compensation issues remained to be evaluated after Plaintiff began working. Defendant Ficco agreed to include that provision, and Plaintiff accepted employment in reliance upon Defendants' agreement to conduct that review. Although the written Employment Agreement provided for the three-month compensation review, Defendants never conducted it.

35.    Plaintiff's responsibilities included dietary operations, staffing, scheduling, menu development, purchasing, vendor coordination, sanitation oversight, budgeting, and day-to-day operational management within the dietary department.

36.    Throughout Plaintiff's employment, Defendants regularly required Plaintiff to perform duties well outside the scope of his position as Food Service Director, including maintenance, plumbing, commercial kitchen equipment repair, emergency operational repairs, repair coordination, and other work ordinarily assigned to maintenance personnel or outside contractors. Plaintiff performed these duties to keep the facility operating when maintenance personnel were unavailable or Defendants elected not to retain outside contractors. Defendants knowingly accepted the benefit of Plaintiff's additional labor without additional compensation, reducing maintenance and contractor costs.

37.    Defendant Scharf additionally directed Plaintiff to perform tasks unrelated to Plaintiff's Food Service Director responsibilities, including transporting Defendant Scharf's personal vehicle for inspection and cleaning in or around July 2025.

### B.  **Protected Activity and Resulting Retaliation**

## 1.  Union Advocacy and Employee Representation Concerns

38.     Throughout Plaintiff's employment, Plaintiff regularly worked alongside bargaining-unit employees and advocated on their behalf concerning union issues, staffing, compensation, scheduling, workplace treatment, and other employment matters.

39.     During 2024 and 2025, Plaintiff repeatedly advocated for employees attempting to join the union, including employees Jazmin and Josefa ("Yvette").

40.     Plaintiff observed and repeatedly raised concerns that union access, representation, and eligibility determinations were applied inconsistently among employees and departments, including delays, obstruction, and inconsistent representation.

41.     Plaintiff directed employees to contact union representatives regarding representation concerns, benefit issues, and union-status disputes.

42.     Plaintiff also questioned selective wage increases provided to certain union-affiliated employees, including the shop steward and maintenance personnel, while other employees and departments did not receive similar treatment.

43.     During the November 2025 transition, Defendant Pirutinsky directed Plaintiff to reassign bargaining-unit employee Penny. Plaintiff advised that any reassignment affecting a union employee should first be addressed with the Union. Plaintiff consulted Defendant Elkins, the shop steward, who advised that the employee should first be given an opportunity to perform the position. Plaintiff relayed that information to Defendant Meira Pirutinsky when she again instructed Plaintiff to reassign the employee.

## 2. Wage, Onboarding, Workplace Conditions, Safety, and Harassment Concerns

11

44.     Plaintiff additionally raised concerns regarding wage practices, onboarding deficiencies, staffing shortages, employee treatment, workplace conditions, and operational practices affecting employees.

45.     Plaintiff repeatedly reported wage-and-hour violations affecting employees, including unpaid overtime, off-the-clock work, meal-break deductions, delayed wages, payroll irregularities, rate-of-pay notice deficiencies, and unpaid spread-of-hours compensation.

46.     During those communications, Plaintiff specifically advised Defendants Pirutinsky and Ficco that employees were not being properly compensated for ten-hour spread pay. Defendant Pirutinsky acknowledged the issue and represented, in substance, that eligible employees would be properly paid going forward.

47.     Plaintiff additionally raised concerns involving workplace treatment, inappropriate conduct, harassment, employee safety, and unsanitary conditions within basement employee-accessed work and storage areas, including a discarded used condom left in a basement storage room. Plaintiff also repeatedly complained about an unsanitary employee bathroom that remained unclean despite repeated complaints to management.

### 3. Resident Care and Operational Concerns

48.     Plaintiff repeatedly raised concerns regarding employees being expected to perform resident wellness monitoring, resident supervision, medication-related functions, and other resident-care activities outside their ordinary job responsibilities. Plaintiff further reported that residents receiving services from Link Home Care and other third-party providers were at times left unattended in common areas for extended periods and that facility employees, including dietary personnel and other non-clinical staff, were expected to supervise, monitor, escort, or otherwise assume responsibility for residents who were assigned to those providers. Plaintiff reasonably believed these practices

12

created resident safety risks, reflected inadequate staffing or supervision, and exceeded the ordinary responsibilities of non-clinical employees.

### 4. Environmental and Regulatory Compliance Concerns

49. During Plaintiff's employment, Plaintiff repeatedly reported and objected to operational, maintenance, plumbing, refrigeration, water-system, and environmental-related issues affecting the facility, including conditions Plaintiff reasonably believed posed sanitation, safety, operational, and regulatory concerns impacting residents, employees, and food-service operations. Plaintiff observed recurring plumbing, water-system, leak, flooding, and maintenance-related issues, including repairs performed without what Plaintiff reasonably believed to be appropriate permits, inspections, or qualified personnel. Plaintiff repeatedly raised concerns regarding these conditions and reasonably believed Defendants failed to timely address or remediate them despite ongoing complaints and operational difficulties.

50. Plaintiff additionally observed environmental and facility conditions involving mold, ventilation failures, refrigeration issues, excessive heat, sanitation concerns, waste management, pest-related conditions, and other building-maintenance deficiencies that Plaintiff reasonably believed adversely affected employees, residents, and facility operations. Plaintiff repeatedly raised these concerns and reasonably believed Defendants failed to timely or adequately remediate them.

### 5. PHI, Privacy, and Compliance Concerns

51. In or around 2023 through 2024, Plaintiff raised concerns regarding the handling, distribution, access, and transmission of sensitive resident medical information after receiving communications containing highly sensitive personal and medical details concerning residents.

52.     Plaintiff additionally raised concerns regarding operational, licensing, regulatory, compliance-related, privacy, and communication practices occurring within the facility. Less than approximately two months after Plaintiff raised certain privacy and communication concerns, Defendants implemented changes to staff-notification and communication practices that limited employee visibility regarding the recipients of certain communications.

**6. Hidden Camera, Harassment Reports, and Escalating Retaliation**

53.     On or about February 6, 2025, Plaintiff reported to Defendant Ficco that a concealed surveillance device, disguised as a carbon monoxide detector, had been installed in an employee locker room and changing area without Plaintiff's prior knowledge or notice. Plaintiff objected that employees, including union members, routinely engaged in confidential workplace discussions in that area and expressed concerns regarding employee privacy and workplace surveillance. Plaintiff further advised Defendant Ficco that he was on an approved medical leave but had curtailed that leave and returned to work, in part, because of the seriousness of the surveillance incident and the concerns it raised.

54.     On or about February 10, 2025, Plaintiff raised the same concerns during a meeting with Defendants Ficco and Bokchin. During that meeting, Defendants acknowledged, in substance, that Plaintiff should have been informed before the device was installed, represented that Plaintiff would be notified before similar surveillance devices were installed in the future, and stated that the concealed device had been removed. Despite Plaintiff's complaint, Defendants conducted no meaningful investigation, provided no written findings, and failed to advise Plaintiff of any corrective action beyond the removal of the device.

55.     During the February 10, 2025 meeting, Plaintiff also reported concerns regarding repeated inappropriate workplace conduct by Defendant Jeff Elkins toward female employees. Plaintiff disclosed several incidents that had been reported to him by employees or personally observed by Plaintiff, advised

14

Defendants that female employees had expressed discomfort being alone with Defendant Elkins, and requested that the reported conduct be investigated. Plaintiff alleges Defendants failed to conduct a meaningful investigation, failed to interview affected employees or other witnesses, failed to communicate the results of any investigation, and permitted Defendant Elkins to continue exercising authority over workplace surveillance, reporting, and union-related matters affecting Plaintiff.

56.     Beginning in February 2025, after Plaintiff reported concerns regarding workplace surveillance, hidden cameras, employee privacy, harassment, and other workplace issues, Defendants progressively reduced Plaintiff's authority as Food Service Director. Management bypassed Plaintiff by issuing directives directly to his staff, requiring upper-management approval for routine operational decisions, and increasing scrutiny of his work. Defendant Ficco increasingly relied on false, biased, or misleading reports from Defendant Jeff Elkins rather than conducting an independent inquiry or discussing those matters with Plaintiff, and threatened Plaintiff and his staff with suspension based on those reports. Plaintiff alleges that this pattern of reporting and reliance on Defendant Elkins' reports continued for months and persisted through the events immediately preceding Plaintiff's termination in November 2025.

57.     At the same time, Defendants substantially increased Plaintiff's workload by reducing or eliminating assistant-manager and cook support while assigning additional administrative responsibilities, reporting requirements, inventory tasks, equipment coordination, manual food-service work, and after-hours communications. Plaintiff was routinely expected to remain available outside normal working hours and frequently performed work from home. These actions interfered with Plaintiff's ability to perform his duties effectively and, according to Plaintiff, were undertaken in retaliation for his continued protected activity.

58.     These actions intensified during the November 2025 ownership transition. Although Defendants continued referring to Plaintiff as Food Service Director or management, Plaintiff spent the majority of his working time

15

performing the same manual duties as hourly employees, including cooking, serving residents, dishwashing, and food preparation. His authority to hire, fire, discipline, establish compensation, or independently manage departmental operations was substantially diminished, and Defendants increasingly treated him as a non-managerial employee while simultaneously asserting he was management when questioning his union eligibility. Plaintiff alleges this inconsistent treatment formed part of the retaliatory conduct that culminated in his termination.

59.    During Plaintiff's employment, Defendants maintained multiple surveillance systems throughout the facility. Plaintiff observed increasing workplace surveillance and monitoring practices affecting employees, including at least two separate surveillance camera systems operating concurrently, concealed surveillance devices in employee-accessed areas, surveillance cameras directed toward Plaintiff's workspace and office area, and biometric facial-recognition timekeeping systems.

60.    Defendants installed a concealed surveillance device disguised as a carbon monoxide detector in an employee locker room and changing area without informing employees of its true nature or obtaining their knowledge or consent. Plaintiff later observed a similar concealed surveillance device of the same type installed in a basement employee break area.

61.    Defendants also maintained surveillance cameras covering operational and employee-accessed areas, including the kitchen, basement employee work and break areas, and areas directed toward Plaintiff's workspace and office. Upon information and belief, certain surveillance devices possessed audio-recording capability and had been in operation throughout Plaintiff's employment. Although signage referenced audio and video monitoring in certain areas, employees were not provided meaningful notice regarding the nature, scope, locations, or audio-recording capabilities of the surveillance, nor were they asked to provide informed consent.

62.    In or about one week before the November 2025 ownership transition, Defendants implemented biometric facial-recognition timekeeping

16

systems and required employees to register and use those systems while simultaneously requiring use of existing timekeeping methods. Employees were not provided written disclosures, consent forms, or policies concerning the collection, retention, storage, or destruction of biometric information.

63. Avrohom "Vinny" Vinitsky Corporate Project Manager of Defendant Center Management Group participated in the implementation and administration of the biometric facial-recognition timekeeping system.

64. Defendant Jeff Elkins, acting as Head of Security, exercised substantial control over Defendants' multiple concurrent surveillance systems, including remote access to surveillance footage. Plaintiff further alleges that surveillance devices were installed and maintained under Defendant Elkins's direction, including installations occurring outside normal business hours. Upon information and belief, certain surveillance devices, including those placed in employee areas, were installed under the pretense of addressing operational concerns such as theft, without full disclosure regarding their nature, placement, or scope. Plaintiff further alleges that certain surveillance devices were physically installed by an individual known to Plaintiff as "Shammy," acting at Defendant Elkins's direction and/or at the direction of facility management personnel.

65. Defendant Elkins reviewed and collected surveillance footage of employees, including bargaining-unit employees, both at management's request and on his own initiative. Internal communications reflect that Defendant Elkins routinely provided surveillance footage and observations to management.

66. Surveillance systems were therefore used not solely for legitimate security purposes, but also to monitor employees, document alleged workplace violations, support disciplinary actions, and increase scrutiny of Plaintiff and other employees within the dietary department by union-affiliated personnel, including Defendant Jeff Elkins, who reported employee activities to management in a manner Plaintiff reasonably believed was selective, exaggerated, misleading, or retaliatory.

67. Following Plaintiff's complaints regarding the concealed surveillance device, and following his other protected complaints concerning

17

wages, union issues, workplace conditions, and resident care, Plaintiff experienced increased monitoring, surveillance, scrutiny, and retaliatory treatment. Plaintiff was on an approved medical leave when he discovered and reported the concealed surveillance device. Because of the seriousness of the surveillance incident and Defendants' response, Plaintiff curtailed his approved medical leave and returned to work before his shoulder had adequately healed, resulting in additional pain, physical limitations, and delayed recovery.

### C. **Union Status, Representation, and Transition**

68.    In or about October 2023, Plaintiff entered into a written Employment Agreement providing that Plaintiff would be offered membership in Local 713 IBOTU, UMD, ILA, together with union-related benefits, including employer-paid family health coverage and participation in the Local 713 Annuity Fund. During the negotiation of that agreement, Plaintiff specifically sought employer-paid family health coverage as part of his compensation package. Defendant Ficco structured Plaintiff's compensation and employment arrangement to provide those benefits through union participation.

69.    Plaintiff did not seek union membership for its own sake; rather Defendant Ficco presented union membership as the mechanism through which the negotiated compensation and benefit package would be provided under the Employment Agreement.

70.    When Plaintiff questioned whether his management position created any issue with union membership, Defendant Ficco advised Plaintiff that other supervisors were also members of the Union, thereby assuring Plaintiff that his participation was appropriate. Defendant Ficco also reiterated that she essentially had the same health coverage as the Plaintiff would be receiving, but it was not a family plan.

71.    Consistent with that agreement, Plaintiff was enrolled in Local 713 by Defendant Elkins, the facility's shop steward. Throughout Plaintiff's employment, Defendants deducted union dues, provided union-related benefits,

18

including employer-paid family health coverage, and never informed Plaintiff that he was allegedly ineligible for union membership. Plaintiff continued his employment in reliance on those representations.

72.    As Plaintiff's shop steward, Defendant Elkins was familiar with Plaintiff's actual job duties and responsibilities long before Plaintiff requested union representation or the Union later asserted that Plaintiff was ineligible for membership.

73.    On or about October 23, 2025, during the ownership transition, Defendant Bokchin asked Plaintiff whether Plaintiff would leave the union and represented that Plaintiff's compensation, health coverage, sick leave, vacation benefits, and other employment terms would otherwise remain substantially the same.

74.    On or about October 24, 2025, Plaintiff advised Defendant Ficco that he wanted to understand exactly how such a change would affect his compensation, health insurance, benefits, and employment terms. Defendant Ficco responded that Plaintiff was "technically" management, despite having previously structured Plaintiff's Employment Agreement to include union membership, employer-paid family health coverage, and union-related benefits, and despite assuring Plaintiff at the outset of his employment that other supervisors also participated in the Union.

75.    Defendant Ficco further represented that Plaintiff would maintain substantially the same health insurance, would no longer pay union dues, would lose only the union annuity, and that Defendants would "make it up" to Plaintiff in another way. On that same day, Richmond 26 Operating LLC filed an assumed name (d/b/a) for "Esplanade Staten Island." Plaintiff alleges that this filing occurred contemporaneously with Defendants' efforts to alter Plaintiff's employment status and negotiated employment terms.

76.    Plaintiff relied upon the representations made by Defendants Bokchin and Ficco by continuing his employment through the ownership transition. Based upon those assurances, Plaintiff reasonably believed the promised compensation, health coverage, benefits, and employment terms would

19

remain substantially the same and that clarification concerning those terms would be provided before the transition. After Plaintiff had already begun working for Richmond 26 Operating LLC and the requested clarification was not provided, Plaintiff repeatedly requested written clarification concerning his compensation, health coverage, classification, benefits, and employment terms.

77.    Despite Defendants' position that Plaintiff allegedly did not qualify for union membership, union dues continued to be deducted from Plaintiff's wages through November 2025, including during the month Plaintiff was terminated, reinforcing Plaintiff's understanding that both Defendants and the Union continued to recognize him as a union member.

78.    Plaintiff communicated these concerns through emails sent on November 15 and November 17, 2025, including communications directed to Defendants Pirutinsky and Ficco, after the meeting Plaintiff had requested with Defendant Ficco concerning his union status, compensation, health coverage, and employment terms never occurred.

79.    At approximately 12:24 a.m. on November 18, 2025, eight days after the ownership transition and after Plaintiff had already begun working for the new entity, Defendant Pirutinsky responded by requesting that Plaintiff confirm he was no longer participating in the Union and asserting that supervisors were not eligible for union membership. Defendant Pirutinsky further stated that, upon such confirmation, she would be happy to send Plaintiff an offer letter.

80.    Plaintiff responded that he remained a union member, that his Employment Agreement expressly provided for union membership and union-related benefits, that he remained willing to complete all required documentation and he would not waive or surrender his contractual rights, compensation, health coverage, union status, or benefits unless any proposed changes were first provided to him in writing.

81.    Later that same day, immediately after the StaffLion meeting, Plaintiff requested union representation during a confrontation with Defendants Gros and Pirutinsky. Defendant Elkins did not meet privately with Plaintiff or

20

investigate Plaintiff's concerns before meeting with management and thereafter failing to advocate on Plaintiff's behalf.

82.    Plaintiff reasonably believed Defendants' position concerning his alleged supervisory status was inconsistent because, while asserting that Plaintiff was management for purposes of removing him from union membership and representation, Defendants had simultaneously reduced Plaintiff's managerial authority throughout 2025, with that reduction becoming more pronounced during the ownership transition by requiring upper-management approval for routine operational decisions, bypassing Plaintiff's supervisory authority, limiting Plaintiff's discretion, and increasingly treating Plaintiff as a non-managerial employee in practice.

83.    Plaintiff was terminated on November 19, 2025.

84.    Before Plaintiff's termination meeting on November 19, 2025, Plaintiff emailed Defendants Ficco and Pirutinsky, copying Defendant Elkins, Robert Vella, and Kevin Watts, reaffirming that he remained willing to complete onboarding while continuing to request written clarification concerning his employment terms. Defendant Elkins did not respond before the meeting.

85.    Prior to Plaintiff's request for union representation and subsequent termination, neither Local 713 nor Defendant Elkins informed Plaintiff that his union eligibility was being questioned, despite Plaintiff's enrollment in the Union, the continued deduction of union dues, the provision of union-related benefits, and Plaintiff's participation as a union member throughout his employment. The Union first asserted that Plaintiff was allegedly ineligible for union membership only after Plaintiff requested union representation in connection with his termination.

86.    On November 20, 2025, Local 713 informed Plaintiff in writing that it would not represent him and asserted for the first time that Plaintiff had allegedly been ineligible for union membership because he was management, despite previously accepting Plaintiff's membership, collecting union dues throughout his employment, administering union-related benefits, and treating

21

Plaintiff as a union member. The Union further represented that Plaintiff's union dues and annuity contributions would be refunded.

87. Local 713 did not provide Plaintiff with any meaningful opportunity to challenge its determination regarding his alleged union ineligibility, did not advise Plaintiff of any internal appeal procedure, hearing, or review process, and denied representation without first providing Plaintiff an opportunity to be heard.

88. The Union did not conduct a meaningful investigation into Plaintiff's actual duties, did not investigate the substantial reduction in Plaintiff's managerial authority, did not challenge Defendants' asserted basis for denying representation, did not investigate the successor-employer issues arising from the ownership transition, did not meet with Plaintiff privately to obtain Plaintiff's account before adopting management's position regarding Plaintiff's eligibility for representation, and instead adopted management's position without conducting an independent inquiry before denying Plaintiff representation.

89. On or about November 19, 2025, following Plaintiff's termination, Plaintiff submitted a written grievance to Local 713 requesting, among other things, that relevant video footage and other evidence relating to his termination be preserved and requesting that the Union challenge Defendants' actions.

90. Plaintiff subsequently submitted written requests, including requests dated February 11, 2026, and March 10, 2026, seeking plan documents, contribution records, hours reported, Summary Plan Descriptions, benefit records, and other information relating to his union participation and benefits. Defendants, the Union, and/or the related benefit entities failed to provide the requested records within the time required by law.

91. Neither Local 713 nor any Defendant advised Plaintiff that his requests had been directed to the wrong entity, identified the proper plan administrator, or otherwise responded by providing contact information for the individual or entity responsible for maintaining the requested records. Instead, Plaintiff's written requests went unanswered.

22

**D.  Employment Transition & StaffLion**

92.    During the November 2025 transition, Rachel Horowitz which is publically listed as the Recruitment Director for Catholic Health Group, participated in staffing and scheduling activities, met with Plaintiff and transition personnel, and communicated directly with Plaintiff using a @chg.com email address regarding employee hours and the facility's master schedule.

93.    On November 11, 2025, Plaintiff and other employees unexpectedly received electronic onboarding links requiring them to complete onboarding through a new online portal.

94.    Plaintiff repeatedly requested clarification regarding those employment terms before completing onboarding. Defendant Pirutinsky advised that additional employment and benefit information would be provided later, but Defendants nevertheless required employees to proceed before providing that information, reinforcing Plaintiff's understanding that employees were expected to proceed before receiving complete employment information.

95.    Rachel Horowitz further participated in transition-related scheduling activities, including communications concerning employee schedules and the upcoming StaffLion Microsoft Teams meeting. That meeting was proposed on November 17, 2025, approximately two days after Plaintiff emailed Defendant Ficco, the first time, requesting written clarification concerning his employment terms.

96.    On or about November 18, 2025, Rachel Horowitz participated in the Microsoft Teams meeting concerning StaffLion scheduling and transition-related operational matters immediately preceding Plaintiff's confrontation by Defendants Charles-Edouard Gros and Pirutinsky. Plaintiff alleges that Rachel Horowitz participated in transition-related operational activities affecting staffing and scheduling during the ownership transition.

97.    During the November 2025 operational transition, Defendants introduced and attempted to implement scheduling and operational systems associated with "StaffLion." Plaintiff was instructed to participate in a Microsoft

23

Teams meeting concerning StaffLion scheduling, operational matters, and the upcoming Thanksgiving work schedule. Although originally scheduled for approximately thirty minutes, then one hour, the meeting continued substantially longer than anticipated.

98.    Plaintiff participated in a StaffLion-related Microsoft Teams meeting that extended substantially beyond its scheduled duration. Plaintiff was instructed to remain in his office throughout the meeting while management personnel coordinated other activities within the facility. Plaintiff observed repeated delays and irregularities during the meeting, including portions that were restarted or extended, and Defendant Ficco joined well after the meeting had already begun.

99.    During the meeting, Defendant Pirutinsky, who was herself participating in the same Teams meeting, sent Plaintiff an email requesting to discuss employment-related matters. Plaintiff did not view or respond to the email because he was actively participating in the extended meeting and neither Defendant Pirutinsky nor Defendant Ficco verbally mentioned the email or otherwise raised those employment matters during the meeting. Approximately forty seconds after the meeting concluded, Defendants Gros and Pirutinsky confronted Plaintiff in his office regarding his employment.

100.    Plaintiff alleges that the StaffLion meeting appeared to be used to isolate him in his office while management coordinated employment-related and operational activities outside his presence immediately before his confrontation and termination. Plaintiff reasonably believed the meeting formed part of the escalating scrutiny, pressure, intimidation, and retaliatory conduct directed toward him during the ownership transition. Plaintiff further alleges that the meeting was used, at least in part, to obtain the upcoming holiday work schedule that Plaintiff had already prepared weeks prior, after employees submitted their holiday scheduling requests.

101.    Based on public records, StaffLion's Co-founder and certain members of executive leadership previously held executive positions with Defendant Center Management Group and other affiliated entities.

102.    Plaintiff further alleges that individuals associated with StaffLion and Catholic Health Group, as well as Defendant Center Management Group,

24

assisted in the implementation, and participated in the Microsoft Teams meeting conducted during the November 2025 operational transition. Despite those efforts, the StaffLion platform was never meaningfully implemented at Esplanade Staten Island. Plaintiff understood StaffLion to be intended not only as a centralized management tool but also as an employee scheduling platform through which employees could view work schedules, request time off, and exchange shifts upon submission and approval.

103. Plaintiff further alleges that publicly available information reflects additional professional relationships among individuals associated with StaffLion, Defendant Center Management Group, and other owners, operators, consultants, and management personnel within the nursing-home and assisted-living industry.

## E. Escalating Retaliation, Confrontation, and Termination

104. Plaintiff personally observed similar operational patterns affecting the facility's prior Food Service Director, including reduction of authority, excessive workload, and continued operational reliance despite deteriorating employment conditions during the months preceding her separation from employment. Plaintiff further notes that the former Food Service Director later asserted related allegations in Malone v. Esplanade Staten Island LLC, No. 1:25-cv-02206 (E.D.N.Y.). Plaintiff references that publicly filed action solely as background supporting his observation that the treatment he experienced appeared consistent with a recurring pattern, not as proof of the truth of the allegations asserted in that case.

105. During the period immediately preceding Plaintiff's termination, Defendant Ficco, who had previously been accessible to Plaintiff concerning operational and employment matters, became increasingly unavailable and avoided substantive discussions regarding Plaintiff's employment terms, union status, and transition-related concerns.

106. On or about October 29, 2025, one day after Plaintiff raised workplace, wage, operational, resident-care, and transition-related concerns

25

during a scheduled ownership-transition meeting, Plaintiff met with Defendants Charles-Edouard Gros and Pirutinsky. During that meeting, Plaintiff was instructed not to discuss "past issues," not to involve himself in matters outside his department, and to focus only on future operations. Plaintiff reasonably understood these directives as discouraging further complaints regarding the issues he had previously reported and as a warning that continuing to raise such concerns could jeopardize his employment.

107. On or about November 17, 2025, Defendants distributed a written notice to residents concerning charges for pickup meal orders bearing Plaintiff's name. Defendant Pirutinsky had previously represented that Plaintiff would be permitted to review and approve the notice before distribution. Instead, the notice was circulated without Plaintiff's review or approval. Plaintiff alleges Defendants continued using his name, authority, and work product for operational purposes while simultaneously withholding information regarding his employment status and the actions being taken concerning his continued employment.

108. On November 18, 2025, immediately following the StaffLion Microsoft Teams meeting, Defendants Gros and Pirutinsky entered Plaintiff's office and confronted Plaintiff regarding his employment status, union membership, onboarding, and employment classification. Plaintiff reasonably believed the confrontation was intimidating because it occurred in a confined office setting, Defendants positioned themselves in a manner restricting Plaintiff's ability to leave, and Plaintiff was pressured regarding his employment status. During the confrontation, Defendant Gros demanded that Plaintiff identify his own employment classification despite Plaintiff's repeated written requests that Defendants clarify that very issue.

109. Plaintiff immediately requested union representation and identified Defendant Elkins, the Local 713 shop steward, as his representative. Defendant Gros initially stated "who is Jeff". Plaintiff explained that Jeff was the shop steward and advised that he would not continue the discussion without union representation. Defendant Gros then moved out of the doorway.

110. Approximately thirty minutes later, Defendant Elkins arrived for his scheduled shift and clocked in. Within approximately one minute, Defendants Gros and Pirutinsky exited Defendant Ficco's office, Defendant Pirutinsky returned to retrieve Defendant Ficco, and all three approached Defendant Elkins. Defendants Gros, Pirutinsky, Ficco, and Elkins then entered Defendant Ficco's office together, where they remained for approximately thirty minutes before exiting separately, within a minute or two of each other.

111. Plaintiff was excluded from that meeting and was not informed what was discussed. Before entering the meeting, Defendant Elkins did not first meet privately with Plaintiff, discuss Plaintiff's concerns, investigate Plaintiff's actual job duties or reduced managerial authority, or otherwise prepare to represent Plaintiff.

112. Later that evening, Plaintiff emailed Defendants Pirutinsky and Ficco, copying Defendant Elkins. Plaintiff reaffirmed his willingness to complete onboarding while preserving his employment rights.

113. Defendant Elkins did not respond to Plaintiff, contact Plaintiff, or otherwise communicate with Plaintiff before the following day's meeting. Defendant Elkins only replied to Defendant Pirutinsky's attempt to schedule a proposed meeting for the following day.

114. On the morning of November 19, 2025, Defendant Ficco responded to Plaintiff's recent complaints concerning resident supervision and neglect. That same morning, Plaintiff responded to Defendant Pirutinsky with Defendant Patrice Ficco copied on the communication regarding employee compensation, payroll practices, and spread-of-hours compensation. These communications occurred only one day after Defendant Pirutinsky challenged Plaintiff's union status and only hours before Plaintiff's termination.

115. Approximately forty-five minutes before the termination meeting, Defendant Pirutinsky requested the upcoming holiday work schedule Plaintiff had previously prepared be uploaded to StaffLion's platform.

116. Approximately thirty minutes before the meeting, Defendant Pirutinsky emailed Plaintiff's previously made menus to Benjamin Fuoco, Food

27

Service Director at The Plaza at Clover Lake, and Stephen Kossluk, the building administrator/director of The Plaza at Clover Lake, copying Plaintiff despite Plaintiff having no prior involvement with that facility. Plaintiff alleges the timing of this communication reflected Defendants' coordination of operational responsibilities and dissemination of Plaintiff's work product immediately before terminating his employment.

117.   Plaintiff observed CMG-affiliated personnel, including Dillin Williams, Krystle Neil-Briggs, and other personnel associated with Bensonhurst Center for Rehabilitation and Healthcare, at Esplanade Staten Island hours before Plaintiff's termination.

118.   Following Plaintiff's termination, Briana Romano of Bensonhurst Center for Rehabilitation and Healthcare, Benjamin Fuoco, and possibly Stephen Kossluk appeared at Esplanade Staten Island in connection with inventory review, kitchen operations, and the transition of Plaintiff's duties.

## F.  Post-Termination Events

119.   Following his termination, Plaintiff obtained employment and payroll records that further clarified Richmond 26 Operating LLC's role in payroll administration and the corporate relationships among Defendants. Plaintiff also observed delayed, incomplete, inconsistent, altered, backdated, and otherwise irregular payroll, onboarding, rate-of-pay, and employment records, while Defendants continued using Plaintiff's menus, operational systems, procedures, vendor relationships, and other work product.

## VII. WAGE, ONBOARDING, AND RECORDKEEPING VIOLATIONS

120.   Throughout Plaintiff's employment, Plaintiff regularly worked approximately 45 hours per week on Defendants' premises. Defendants expected management personnel to remain available outside scheduled working hours to

28

respond to operational issues and work-related communications, including at times when Plaintiff's Assistant Food Service Director or other supervisory personnel were physically present at the facility.

121.    In addition to those on-premises hours, Defendants routinely required Plaintiff to perform substantial work away from the workplace, including responding to work-related emails, text messages, telephone calls, ordering, scheduling, inventory matters, menu revisions, employee issues, and other management responsibilities from home, while on vacation, and during approved medical leave. During the November 2025 ownership transition, Plaintiff also assisted Defendant Meira Pirutinsky with transition-related operational coordination, staffing and scheduling matters, onboarding implementation, and other transition-related assignments she directed Plaintiff to perform. Including this off-premises work, Plaintiff regularly worked approximately 50 to 60 hours per week. Defendants knew Plaintiff was performing this work, expected timely responses outside scheduled working hours, accepted the benefit of that work, and failed to compensate Plaintiff for all hours worked, including overtime compensation required by the Fair Labor Standards Act and New York Labor Law.

122.    During approximately the first two months of Plaintiff's employment, Plaintiff frequently worked twelve-hour shifts and had only approximately three days off during that period. As a result, Plaintiff worked well in excess of forty hours during numerous workweeks.

123.    Plaintiff also performed off-the-clock work by responding to calls, text messages, and emails outside scheduled working hours, including while on vacation and during approved medical leave. Throughout the November 2025 ownership transition, Defendants maintained inconsistent and unreliable timekeeping procedures, including requiring employees to use both the existing timekeeping system and a newly implemented biometric facial-recognition system, issuing conflicting instructions regarding clocking in and out for breaks, and experiencing ongoing problems with the timekeeping systems during the transition. Plaintiff alleges these practices contributed to inaccurate recording of

29

hours worked and compensation. Defendants failed to pay spread-of-hours compensation and overtime.

124.   Defendant Ficco acknowledged that Plaintiff was owed unpaid wages post-termination, despite that acknowledgment, Defendant Ficco failed and refused to pay those wages in full.

125.   Payroll practices were irregular, including delayed payroll, combined final wages, and post-dated payments, including payments reflecting periods after Plaintiff's termination.

126.   As a result of such system failures, Plaintiff was required to assist employees after hours with onboarding and related issues.

127.   Employment, payroll, and onboarding records were incomplete, inaccurate, altered, and/or improperly maintained, and Defendants failed to ensure accurate, complete, and legally compliant employment documentation.

128.   Defendant Pirutinsky failed to provide clear and complete post-termination documentation, including a termination letter, final pay breakdown, and a clear explanation of Plaintiff's separation and benefits, despite representing that such documentation would be provided. Plaintiff's final wages were delayed, multiple payroll periods were combined into a single paycheck, payroll records reflected pay periods extending beyond Plaintiff's termination date, and Defendants failed to explain those irregularities or otherwise provide the documentation necessary for Plaintiff to understand his final wages, post-termination pay, benefits, and employment status.

## VIII. IMPROPER 1099 ISSUANCE AND TAX LIABILITY SHIFTING

129.   Prior to and during Plaintiff's employment, Defendant Patrice Ficco informed Plaintiff that Esplanade of Woodmere was a "sister company" to Esplanade Staten Island. Before Plaintiff became an employee, Defendant Ficco attempted to recruit Plaintiff and/or Plaintiff's associates to work there. Throughout Plaintiff's employment, Plaintiff observed continuing operational coordination between the two facilities.

30

130. In or about May 2025, while Plaintiff was employed as Food Service Director at Esplanade Staten Island, Defendant Aaron Bokchin, acting in his capacity as an owner and person with authority over Plaintiff's employment, directed Plaintiff to contact Defendant Hindel Jesselson and coordinate repair work for Esplanade of Woodmere using repair personnel Plaintiff had previously used at Esplanade Staten Island.

131. Plaintiff complied with those instructions because Plaintiff reasonably understood them to be part of Plaintiff's employment responsibilities. Plaintiff also believed that assisting Esplanade of Woodmere would demonstrate Plaintiff's value to Defendants, show Plaintiff was a team player, and further strengthen Plaintiff's employment relationship.

132. Following Defendant Bokchin's instructions, Plaintiff contacted Defendant Hindel Jesselson and thereafter served as the intermediary between Defendant Jesselson and the repair personnel throughout the repair projects. Defendant Jesselson communicated directly with Plaintiff through her @meridiansenior.com email address, telephone calls, and text messages. Defendants Bokchin and Jesselson repeatedly relied upon Plaintiff to coordinate the repairs, thanking Plaintiff on multiple occasions for doing so.

133. Plaintiff did not operate a repair business, was not retained as an independent contractor, and did not expect to receive compensation or profit from arranging the repairs. Plaintiff was acting solely to assist Defendants at their request.

134. To carry out Defendant Bokchin's instructions and ensure the repairs were completed without delay, Plaintiff advanced approximately $2,000 of his own money to pay the repair personnel. Plaintiff expected to be reimbursed by Defendants, consistent with prior repair-related transactions at Esplanade Staten Island, where Plaintiff had advanced funds, submitted receipts through the facility's petty-cash reimbursement process, and later received reimbursement.

135. Only after the repair work had been completed and the repair personnel requested payment was Plaintiff informed that reimbursement could not be processed unless tax paperwork was completed. The repair personnel declined

31

to complete the requested tax forms because they had not previously been required to do so.

136. Defendant Bokchin then stated to Plaintiff, in substance, that anyone could complete the required paperwork and further represented that he would "make it up" to Plaintiff if Plaintiff completed it. Relying on Defendant Bokchin's oral representations, Plaintiff completed the requested paperwork so he could recover the money he had already advanced.

137. After the second repair transaction, Plaintiff became concerned that he was being exposed to personal tax consequences. Plaintiff therefore offered to locate repair personnel closer to the Woodmere facility so Defendants could work directly with local contractors. Defendant Jesselson advised Plaintiff, in substance, that she preferred continuing to use the same repair personnel because they were already familiar with the building and its equipment.

138. Plaintiff had never before completed tax paperwork in connection with reimbursement payments of this nature and did not initially understand that Defendants would later characterize the reimbursements as nonemployee compensation or issue a Form 1099-NEC reporting them as taxable income. Plaintiff reasonably relied upon Defendant Bokchin's oral promise that he would "make it up" to Plaintiff and believed he would not suffer any resulting financial loss or tax consequences. Defendant Bokchin never fulfilled that promise.

139. In connection with obtaining reimbursement, Plaintiff was required to complete vendor paperwork, including a Form W-9 and a vendor setup form bearing the heading "Meridian Senior Living and Affiliated Communities." Woodmere Operating Company LLC later reimbursed Plaintiff and subsequently issued Plaintiff a Form 1099-NEC reporting $3,112.30 as nonemployee compensation. Based upon Plaintiff's records, Plaintiff does not believe that amount accurately reflects the reimbursements he actually received in year 2025.

140. The amounts reported on the Form 1099-NEC were reimbursements for money Plaintiff advanced to third-party repair personnel on Defendants' behalf. Plaintiff did not perform repair services, did not operate an

32

independent repair business, and did not receive those amounts as compensation or profit.

141.    Plaintiff's tax preparer later advised him that the Form 1099-NEC could increase his tax liability by approximately $1,000. Plaintiff alleges that Defendants improperly characterized reimbursement payments as nonemployee compensation, thereby shifting tax-reporting obligations and potential tax liability to Plaintiff. Plaintiff further alleges that the amount reported on the Form 1099-NEC exceeded the reimbursements he believes he actually received and expects the basis for Defendants' calculations to be established through discovery.

## IX. Protected Reports Concerning Resident Safety, Facility Operations, and Regulatory Compliance

### A.  Resident Care

142.    Plaintiff repeatedly reported resident neglect, inadequate supervision, insufficient staffing, and operational practices affecting resident safety. Plaintiff observed residents—including residents receiving services from Link Home Care and other third-party providers—being left unattended for extended periods and objected to practices requiring dietary employees and other non-clinical personnel to supervise, escort, monitor, or otherwise assume responsibility for residents outside their ordinary job duties.

143.    Plaintiff further objected to medication-related practices involving non-clinical personnel and reasonably believed management became increasingly hostile toward Plaintiff after Plaintiff repeatedly raised and refused to ignore resident-care and supervision concerns. On the date of Plaintiff's termination, management communications specifically addressed Plaintiff's prior complaints regarding residents allegedly being left unattended for extended periods, which Plaintiff reasonably believed further connected his complaints and protected activity to the retaliatory actions described herein.

33

144.     Plaintiff observed and objected to operational practices affecting residents based upon disability, cognitive condition, level of care needs, appearance, behaviors associated with impairment, and complaints from other residents, including practices involving resident placement, separation, supervision, and accommodations. Plaintiff reasonably believed certain residents requiring aides, supervision, or higher levels of care were viewed by management as undesirable or negatively affecting the facility's appearance. Plaintiff repeatedly maintained that residents should be treated equally and not be segregated, isolated, or treated differently because of disability, cognitive condition, appearance, or level of care needs, and reasonably believed these objections contributed to the hostility and retaliation directed toward him.

### B. Security / Monitoring

145.     Plaintiff repeatedly observed and reported failures involving front-desk supervision, building monitoring, resident movement, overnight security, visitor monitoring, and operational oversight. Plaintiff reasonably believed inadequate staffing and poor supervision created risks to resident safety, building security, and facility operations.

146.     In or about early August 2025, Plaintiff reported these concerns to Defendant Ficco. Defendant Ficco acknowledged that unauthorized individuals had previously entered the facility because of these issues and further stated, in substance, that front-desk personnel slept during their shifts and there was nothing she could do about it.

147.     Plaintiff observed front-desk and security personnel at times sleeping, inattentive, or distracted from their monitoring responsibilities, while Plaintiff and other non-security employees were increasingly expected to assist with resident monitoring and wellness checks outside their normal job duties. Plaintiff repeatedly reported these concerns but reasonably believed management focused its scrutiny on Plaintiff and his department rather than correcting the underlying security deficiencies.

34

### C. Medical Providers / Privacy

148.    During Plaintiff's employment, Plaintiff observed that residents within the facility often required levels of supervision, assistance, monitoring, and care exceeding what Plaintiff reasonably understood to be consistent with an independent-living environment. Plaintiff additionally observed ongoing operational coordination between facility management and certain third-party healthcare providers and reasonably believed aspects of those relationships raised concerns regarding resident services, provider access, care coordination, operational oversight, and regulatory compliance.

149.    Plaintiff further observed that residents receiving services from certain third-party providers, including residents assigned to cluster-care aides, were frequently left in common areas for extended periods without adequate supervision. Plaintiff also observed that dietary employees and other non-clinical staff were routinely expected to assist with monitoring or supervising such residents when assigned caregivers were unavailable or occupied. Plaintiff reasonably believed staffing limitations contributed to these conditions and repeatedly raised those concerns with management.

150.    Plaintiff observed sensitive resident medical and personal information—including medical records, insurance information, Social Security information, financial documents, trust-related documents, and other protected resident information being distributed through workplace communications among facility personnel and third-party providers without what Plaintiff reasonably believed were adequate safeguards or appropriate limitations on access. Plaintiff repeatedly raised concerns regarding provider interactions, the handling of resident-related information, and these privacy practices, but Defendants failed to take meaningful corrective action.

### X. POST-TERMINATION USE OF WORK PRODUCT

151.    Plaintiff performed substantial work for Defendants, including the development of menus, operational systems, workflow structures, vendor relationships, and cost-control measures that directly supported the facility's day-to-day operations. These materials and systems were developed through Plaintiff's labor, expertise, and time during his employment.

152.    Following Plaintiff's termination, Defendants continued utilizing Plaintiff's work product in ongoing operations and service delivery and, upon information and belief, derived continued operational and financial benefits therefrom, including cost savings and efficiency gains. Plaintiff reasonably believed Defendants continued utilizing his labor and work product while preparing for his removal from employment. Plaintiff was not fully compensated for the value of this work, including Defendants' continued use of such materials and systems after termination, and reasonably believes Defendants were unjustly enriched by retaining and benefiting from his labor without providing fair compensation.

## XI. ONBOARDING IRREGULARITIES, BENEFIT ENROLLMENT, PAYROLL WITHHOLDING, AND EMPLOYMENT DOCUMENTATION

153.    During the November 2025 ownership transition, Defendants required Plaintiff and other employees to complete onboarding through a newly implemented electronic onboarding platform despite unresolved questions concerning compensation, payroll administration, benefits, employment classifications, reporting structure, and the identity of the employing entity.

154.    Before completing onboarding, Plaintiff repeatedly requested written clarification concerning his employment, including a written offer letter, rate of pay, employer identity, reporting structure, health insurance, employee benefits, payroll procedures, onboarding requirements, and other material terms of employment. Plaintiff communicated these requests to Defendants Ficco and Pirutinsky, including through written communications sent before his termination.

36

155.    Defendants did not provide the requested written employment terms before requiring Plaintiff to complete onboarding. Plaintiff alleges he repeatedly sought clarification because Defendants had inquired about his union membership. Then they proceeded to deduct union dues.

156.    Plaintiff remained willing to complete onboarding. Plaintiff did not refuse onboarding. Rather, Plaintiff repeatedly advised Defendants that he wished to understand the material terms and conditions of his employment before completing documents.

157.    Plaintiff further requested paper copies of the Form I-9, Form W-4, direct-deposit authorization, and other onboarding documents before the November 19, 2025 termination meeting. Following his termination, Plaintiff again requested paper copies of those documents while attempting to ensure timely payment of his earned wages. Defendant Pirutinsky refused those requests.

158.    Plaintiff further alleges the electronic onboarding platform required completion of a health-benefit election before the onboarding process could be finalized. Plaintiff emailed management asking whether the health-benefit election could be skipped, Defendants did not answer that request before Plaintiff's termination. The onboarding materials did not include Summary Plan Descriptions, plan summaries, eligibility requirements, waiting-period information, or other benefit information Plaintiff had requested before requiring him to elect or waive health coverage.

159.    During the November 19, 2025 meeting preceding Plaintiff's termination, Plaintiff attempted to explain that he could not complete the health-benefit election because he lacked sufficient information concerning the offered coverage and had previously requested clarification. Plaintiff alleges Defendant Pirutinsky interrupted Plaintiff before he could fully explain his concerns. Plaintiff further advised Defendant Pirutinsky that he had previously emailed regarding those concerns, but Plaintiff alleges Defendant Pirutinsky failed to meaningfully address them.

160.    Plaintiff alleges that the onboarding materials did not include the benefit information he had requested before requiring him to elect or waive health

37

coverage. Defendant Pirutinsky advised Plaintiff that an employee handbook and additional benefit information would be provided later. Nevertheless, Defendants expected employees to make benefit-related elections before providing complete written information regarding the available coverage, eligibility requirements, or other material benefit terms, and the onboarding materials still lacked the information necessary for employees to make informed benefit elections.

161. Plaintiff further alleges that these onboarding and benefit irregularities were not unique to Plaintiff. Upon information and belief, Defendants required numerous continuing employees to complete onboarding as though they were newly hired following the November 2025 operational transition. Plaintiff observed that employees were not timely provided written notices of rate of pay, were required to complete benefit-related onboarding before receiving complete benefit information, and were expected to make benefit elections without Summary Plan Descriptions, eligibility information, or other materials necessary to make informed decisions. Upon information and belief, Defendants also treated continuing employees as newly hired for benefit eligibility purposes despite their continuous employment at the facility.

162. Plaintiff further alleges that employees were informed they would not receive timely payment of earned wages unless onboarding was completed. Plaintiff personally observed and was informed by multiple employees that they experienced delayed wages after encountering onboarding difficulties.

163. Plaintiff further advised Defendants that several employees could not read English, could not adequately navigate the electronic onboarding system, or otherwise required assistance completing the onboarding process. Plaintiff alleges Defendants nevertheless failed to provide adequate assistance, until after the pay period closed, resulting in delayed onboarding and delayed wage payments for certain employees.

164. Plaintiff personally assisted numerous employees after normal working hours with onboarding questions, electronic onboarding issues, and employment documentation because Defendants allegedly failed to provide adequate assistance during implementation of the new onboarding system.

38

165. Plaintiff further alleges the onboarding platform contained numerous irregularities, including requests that employees leave certain fields blank, forms appearing unrelated to particular employees, standardized forms that Plaintiff reasonably believed did not apply to certain employees, and benefit-related documentation that Plaintiff believed lacked sufficient explanatory information. Plaintiff further alleges employee email addresses were not properly verified before onboarding invitations were issued, contributing to additional onboarding difficulties. Plaintiff further alleges that the onboarding links were generic rather than employee-specific, contributing to confusion and onboarding irregularities.

166. Plaintiff further alleges that Defendants conditioned timely payment of earned wages upon completion of onboarding while simultaneously refusing to provide requested employment information, requested paper onboarding documents, and requested clarification concerning wages, benefits, employment status, and payroll documentation. Plaintiff alleges this created a situation in which employees were expected to complete legally significant employment documents without sufficient information while also facing the possibility of delayed payment if onboarding remained incomplete.

167. Defendants later characterized Plaintiff as having failed or refused to complete onboarding and relied, at least in part, upon Plaintiff's alleged failure to complete onboarding as part of the explanation for his termination. Plaintiff alleges that characterization was false and pretextual. Plaintiff repeatedly requested the information necessary to complete onboarding and remained willing to complete onboarding, and attempted to explain his concerns before being interrupted.

168. Following his termination, Plaintiff continued seeking information concerning his employee benefits, health coverage, plan documents, contributions, and other benefit-related records from the Union and/or related benefit entities. Plaintiff alleges those requests, including written requests submitted during 2026, were not meaningfully answered, further preventing Plaintiff from understanding and verifying his benefit rights.

39

## XII. SUMMARY OF PROTECTED ACTIVITY AND LIABILITY THEORIES

169.    Throughout his employment, Plaintiff repeatedly engaged in the protected activities described throughout this Complaint, including complaints concerning wage-and-hour violations, union rights, workplace surveillance, employee privacy, resident safety, environmental hazards, food-safety concerns, building-maintenance and regulatory compliance issues, onboarding deficiencies, payroll practices, employee benefits, and regulatory compliance. Defendants were aware of these complaints and, rather than meaningfully investigating or correcting them, allegedly responded by progressively reducing Plaintiff's authority, increasing scrutiny of his work, bypassing his supervisory responsibilities, challenging his employment status and union rights during the ownership transition, and ultimately terminating his employment.

170.    Plaintiff further alleges that the Corporate Defendants may be held liable under one or more theories of joint employment, successor liability, integrated enterprise, alter ego, agency, centralized control, or other applicable legal doctrines based upon the facts alleged in ¶¶22–26 and throughout this Complaint. The precise legal relationship among the Defendants and the extent of each Defendant's liability are expected to be further established through discovery.

## XIII. CAUSES OF ACTION

171.    Count I – Retaliation in Violation of the Fair Labor Standards Act

172.    Plaintiff repeats and realleges ¶¶44–67 and ¶¶77–118 as though fully set forth herein.

173.    Following Plaintiff's protected activity, Defendants subjected Plaintiff to materially adverse employment actions culminating in his termination.

40

174. Plaintiff's protected activity was a motivating factor in Defendants' decision to retaliate against Plaintiff in violation of 29 U.S.C. §215(a)(3).

175. The close temporal proximity between Plaintiff's protected wage complaints, the October 29, 2025 meeting, the November 18, 2025 confrontation, Plaintiff's request for union representation, and Plaintiff's termination on November 19, 2025, together with the pattern of retaliatory conduct alleged throughout this Complaint, supports an inference that Defendants retaliated against Plaintiff because of his protected activity.

176. As a direct and proximate result, Plaintiff suffered damages and is entitled to all relief available under the Fair Labor Standards Act.

177. Count II – Retaliation in Violation of New York Labor Law §215

178. Plaintiff repeats and realleges ¶¶45–48, ¶¶55–57, ¶¶77–127 and ¶¶153–167 as though fully set forth herein.

179. Plaintiff engaged in protected activity by repeatedly complaining about unpaid overtime, spread-of-hours compensation, delayed wages, payroll irregularities, inaccurate wage records, onboarding practices affecting wages, and other wage-and-hour practices affecting both himself and other employees.

180. Defendants were aware of Plaintiff's protected wage complaints.

181. Defendants falsely characterized Plaintiff as refusing onboarding after Plaintiff repeatedly sought the information necessary to complete the process.

182. As alleged above, following Plaintiff's protected wage complaints, Defendants took materially adverse employment actions against Plaintiff, culminating in his termination on November 19, 2025.

183. Plaintiff's protected wage complaints were a motivating factor in Defendants' retaliatory actions, in violation of New York Labor Law § 215.

184. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered damages and is entitled to all relief available under New York Labor Law § 215, including statutory damages, equitable relief, costs, attorneys' fees where authorized, and such other relief as the Court deems just and proper.

185.    Count III – Whistleblower Retaliation (NY Labor Law §740)

186.    Plaintiff repeats and realleges ¶¶39–167 as though fully set forth herein.

187.    Plaintiff repeatedly disclosed, objected to, and refused to participate in practices that he reasonably believed violated federal, state, and local laws and regulations, including the unlawful practices described throughout this Complaint.

188.    Those protected activities included Plaintiff's complaints and disclosures concerning wage-and-hour violations, unlawful workplace surveillance, inappropriate workplace conduct and harassment, employee safety hazards, resident neglect and supervision concerns, the handling of protected resident information, onboarding and payroll practices, environmental and sanitation conditions, and other regulatory compliance issues that Plaintiff reasonably believed violated federal, state, or local law.

189.    Defendants knew of Plaintiff's protected activity.

190.    As alleged above, Defendants subjected Plaintiff to materially adverse employment actions culminating in his termination because of his protected activity.

191.    Defendants' actions violated New York Labor Law §740.

192.    As a direct and proximate result, Plaintiff suffered damages.

193.    Count IV – Wage and Hour Violations Under the Fair Labor Standards Act and New York Labor Law (Including Unpaid Overtime, Failure to Pay for All Hours Worked, Off-the-Clock Work, Spread-of-Hours Pay, Untimely Payment of Wages, and Unpaid Earned Wages)

194.    Plaintiff repeats and realleges ¶¶45–47 and ¶¶120–128 and ¶¶153–166 as though fully set forth herein.

195.    Defendants failed to pay Plaintiff all wages due under the Fair Labor Standards Act and the New York Labor Law, including compensation for overtime, off-the-clock work, spread-of-hours pay where applicable, earned wages, timely final wages, and other compensation required by law.

42

196. Defendants also failed to maintain accurate wage and time records and failed to comply with applicable federal and state wage-and-hour requirements.

197. Defendants conditioned timely payment of earned wages upon completion of onboarding while refusing to provide the employment information Plaintiff repeatedly requested. Plaintiff experienced delayed wages, irregular payroll practices, and a final paycheck combining multiple payroll periods.

198. As a direct and proximate result, Plaintiff suffered damages and is entitled to all relief authorized by law.

199. Count V – Wage Notice and Recordkeeping Violations (Under NY Labor Law §195 and related wage notice/paystub laws).

200. Plaintiff repeats and realleges ¶¶120–128 and ¶¶153–167 as though fully set forth herein.

201. Defendants failed to provide Plaintiff and other continuing employees affected by the November 2025 operational transition, with accurate and timely written notices of rate of pay as required by New York Labor Law § 195(1). Plaintiff further alleges that certain notices were provided only after employees had already begun working for the successor employer, were backdated, or were not timely provided at all.

202. During and following the November 2025 operational transition, Defendants failed to provide accurate wage statements reflecting, among other things, hours worked, rates of pay, deductions, and employer identity as required by New York Labor Law § 195(3), and further maintained incomplete, inaccurate, inconsistent, delayed, altered, and/or improperly maintained payroll and employment records.

203. Despite Plaintiff's repeated requests for the required employment and wage documentation, Defendants failed to timely provide legally required notices and records, in violation of the New York Labor Law.

204. As a result of these violations, Plaintiff is entitled to statutory damages, penalties, and other relief under New York Labor Law.

43

205.    Count VI – Violation of New York Labor Law § 203-c Failure to Provide Required Notice of Electronic Monitoring

206.    Plaintiff repeats and realleges ¶¶52–66 as though fully set forth herein.

207.    At all relevant times, Defendants monitored employees through electronic surveillance systems located throughout the workplace, including surveillance cameras directed toward Plaintiff's office and work areas, cameras located in employee-accessed areas, concealed surveillance devices, and other electronic monitoring systems.

208.    Defendants used electronic monitoring to observe employee activities, supervise employees, monitor workplace conduct, investigate alleged workplace violations, support disciplinary actions, and increase scrutiny of Plaintiff and other employees.

209.    Defendants failed to provide Plaintiff with the written notice required by New York Labor Law § 203-c advising employees that workplace electronic monitoring may occur.

210.    Plaintiff was never provided written notice of electronic monitoring, never executed any written acknowledgment required by law, and was never provided written policies explaining the nature, scope, operation, or use of Defendants' electronic monitoring systems.

211.    As a direct and proximate result of Defendants' violations of New York Labor Law § 203-c, Plaintiff suffered damages and is entitled to all relief authorized by law.

212.    Count VII – Violation of the Federal Wiretap Act (18 U.S.C. §§ 2511 and 2520)

213.    Plaintiff repeats and realleges ¶¶52–66 as though fully set forth herein.

214.    At all relevant times, Defendants intentionally installed, maintained, operated, authorized, procured, used, and/or disclosed communications obtained through surveillance equipment capable of intercepting oral communications.

44

215.     Defendants installed a concealed surveillance device disguised as a carbon monoxide detector inside an employee locker room and changing area, an employee-only location not open to residents, visitors, or the general public. The device was installed while Plaintiff was on approved medical leave without Plaintiff's knowledge or consent. Plaintiff first discovered the concealed device after returning to work and curtailed his approved medical leave because of the concerns it raised regarding employee privacy and workplace surveillance.

216.     Employees routinely used the locker room and changing area to change clothes, store personal belongings, and engage in confidential workplace discussions concerning employment matters, discipline, wages, union representation, grievances, employee complaints, and other sensitive workplace issues. Employees reasonably believed conversations occurring within that employee-only area would not be secretly intercepted or recorded.

217.     The concealed surveillance device was intentionally disguised so employees would not recognize it as a surveillance camera. Defendants never informed Plaintiff that such a device would be installed inside the locker room, never disclosed whether it was capable of intercepting oral communications, never obtained Plaintiff's consent to the interception or recording of oral communications, and never provided Plaintiff with any written policy explaining the use of audio surveillance. Although Defendants displayed signage stating that audio and video recording occurred on the premises, the signage did not disclose the concealed surveillance device or advise employees that oral communications inside the locker room could be intercepted or recorded.

218.     Plaintiff personally observed that Defendants' surveillance system was capable of recording synchronized audio. In or about late 2023, Defendant Jeff Elkins transmitted surveillance footage to Plaintiff depicting two employees inside the kitchen after business hours. The recording clearly captured the employees' ordinary conversations, demonstrating that Defendants' surveillance system was capable of intercepting oral communications.

219.     Employees, including Plaintiff, routinely conducted telephone conversations and discussed employment matters, union issues, employee

45

compensation, grievances, and workplace complaints in areas monitored by Defendants' surveillance cameras. Because employees were concerned that conversations occurring in the kitchen could be overheard through the surveillance system, employees at times moved sensitive discussions into the locker room believing those conversations could be conducted privately behind a closed door.

220.    After Plaintiff reported the concealed surveillance device, Defendant Ficco advised Plaintiff by email, in substance, that employee Louis had stated, "they are spying on us," referring to the concealed surveillance device. Plaintiff personally recalls that Louis made that statement directly to Plaintiff while the two were alone inside the locker room with no other individuals present. Plaintiff reasonably believes management's subsequent knowledge of that statement supports an inference that oral communications occurring within the locker room may have been intercepted.

221.    After Plaintiff reported the concealed surveillance device, Defendant Ficco informed Plaintiff by text message that she had instructed Defendant Jeff Elkins to delete the locker-room surveillance footage. Defendant Elkins responded, in substance, that the surveillance system automatically deleted footage after seven days. Plaintiff advised Defendant Ficco that this explanation was inaccurate because Defendant Elkins had previously shown Plaintiff surveillance footage that remained available several months after it had been recorded. Defendant Ficco acknowledged Plaintiff's response but did not dispute Plaintiff's statement.

222.    Upon information and belief, Defendants intentionally intercepted, endeavored to intercept, procured the interception of, used, and/or disclosed protected oral communications for purposes beyond ordinary security, including monitoring employees, obtaining information regarding employee activities, assisting employment-related decision-making, and interfering with protected workplace activity.

223.    By intentionally intercepting, endeavoring to intercept, procuring others to intercept, and intentionally using or disclosing protected oral communications, Defendants violated 18 U.S.C. § 2511.

224.    Plaintiff is a person whose oral communications were intercepted, used, and/or disclosed in violation of the Federal Wiretap Act and is entitled to maintain this civil action pursuant to 18 U.S.C. § 2520.

225.    As a direct and proximate result of Defendants' violations of 18 U.S.C. §§ 2511 and 2520, Plaintiff suffered invasion of privacy, emotional distress, curtailment of his approved medical leave, delayed physical recovery, economic harm, and other compensable damages. Plaintiff seeks all relief authorized under 18 U.S.C. § 2520, including actual damages, statutory damages where available, punitive damages where permitted, costs, equitable relief where appropriate, and such other relief as the Court deems just and proper.

226.    Count VIII – Breach of Contract; Alternatively, Equitable Estoppel and Promissory Estoppel

227.    Plaintiff repeats and realleges ¶¶31–38, ¶¶68–90, and ¶¶129–141 as though fully set forth herein.

228.    Plaintiff entered into a written Employment Agreement with Defendant Esplanade Staten Island LLC, acting through Defendant Ficco. The Agreement provided, among other things, for Plaintiff's compensation, a three-month compensation review, employer-paid family health coverage, union-related benefits, and other material terms and conditions of employment.

229.    Plaintiff fully performed his obligations under the Employment Agreement.

230.    Defendants materially breached the Employment Agreement by failing to conduct the agreed three-month compensation review; failing to honor the agreed compensation, employee benefits, and reimbursement provisions of the Employment Agreement; improperly characterizing reimbursable employee business expenses incurred by Plaintiff pursuant to his employment and at Defendants' direction as nonemployee compensation by issuing Plaintiff a Form 1099-NEC in connection with those reimbursements; and attempting to materially

47

alter Plaintiff's contractual rights during the November 2025 ownership transition without Plaintiff's knowledge, agreement, or consent after repeatedly assuring Plaintiff that his compensation and benefits would remain substantially the same while refusing to provide the written clarification Plaintiff repeatedly requested concerning the proposed transition of his employment, compensation, benefits, and other employment terms. Defendants' conduct further deprived Plaintiff of the benefits of his Employment Agreement, frustrated Plaintiff's reasonable contractual expectations, and violated the implied covenant of good faith and fair dealing inherent in every contract under New York law.

231.    In the alternative, and only to the extent Defendants contend that Plaintiff's Employment Agreement or its benefit provisions were lawfully modified, superseded, or terminated during the November 2025 ownership transition, Defendants are equitably estopped from denying Plaintiff's contractual rights because they consistently treated Plaintiff as eligible for union membership and related benefits, deducted union dues, administered those benefits, repeatedly represented that substantially the same compensation and benefits would continue during the transition, and continued accepting Plaintiff's performance after making those representations, upon which Plaintiff reasonably relied to his detriment by continuing his employment and performance.

232.    In the further alternative, should the Court determine that no enforceable contract governed some or all of Defendants' promises concerning Plaintiff's compensation, benefits, continued employment terms, or the reimbursement transactions, Plaintiff alleges promissory estoppel. As alleged in ¶¶73–79 Defendants represented that Plaintiff's compensation, health coverage, sick leave, vacation benefits, and other employment terms would remain substantially the same during the ownership transition. As alleged in ¶¶133–140, Defendant Aaron Bokchin also promised Plaintiff that he would "make it up" to Plaintiff if Plaintiff completed the paperwork required for reimbursement after Plaintiff had already advanced personal funds and acted at Defendants' direction in coordinating the repair work. Defendants made these promises to induce Plaintiff to continue working, continue acting on Defendants' behalf, advance

48

personal funds, and complete the reimbursement process. Plaintiff reasonably relied on those promises by continuing his employment, advancing personal funds, completing the requested paperwork, and accepting reimbursement through Defendants' required process. Defendants failed to honor those promises, causing Plaintiff damages, including lost compensation and benefits, the issuance of the Form 1099-NEC, increased tax liability, and other economic harm.

233.   Plaintiff never executed any written amendment, waiver, or agreement relinquishing the contractual rights and benefits provided under the Employment Agreement.

234.   As a direct and proximate result of Defendants' breach of contract, or, in the alternative, under the doctrines of equitable estoppel or promissory estoppel, Plaintiff suffered lost compensation, lost employee benefits, economic loss, and other damages according to proof.

235.   Count IX – ERISA §510 Interference With Protected Benefit Rights (29 U.S.C. § 1140)

236.   Plaintiff repeats and realleges ¶¶68–91 and ¶¶153–168 as though fully set forth herein.

237.   Plaintiff exercised and attempted to preserve rights protected by ERISA, including employer-paid family health coverage, annuity benefits, and other employee benefit plan rights, by seeking to maintain those benefits, requesting written clarification concerning proposed changes, and refusing to relinquish those rights without written agreement.

238.   Defendants expected Plaintiff to elect or waive employee benefits before providing requested benefit information and later relied upon Plaintiff's alleged incomplete onboarding as part of the basis for his termination.

239.   Defendants interfered with, restrained, and retaliated against Plaintiff for exercising and attempting to preserve those protected rights by conditioning continued employment upon relinquishing union-related benefits, refusing to provide the promised benefit information, and terminating Plaintiff after he refused to surrender those rights.

240.   Defendants' conduct violated ERISA § 510, 29 U.S.C. § 1140.

49

241. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the loss of employee benefits, health coverage, benefit rights, economic damages, and other compensable harm and is entitled to all relief available under ERISA, including appropriate equitable relief, restoration of benefits where available, costs, attorneys' fees where authorized, and such other relief as the Court deems just and proper.

242. Count X – ERISA Violations (Failure to Provide Plan Documents and Records)

243. 29 U.S.C. §§ 1024(b)(4), 1132(a), and 1132(c)

244. Plaintiff repeats and realleges ¶¶68–91 and ¶¶153–168 as though fully set forth herein.

245. On or about February 11, 2026, and March 10, 2026, Plaintiff submitted written requests for documents and records relating to his participation in employee benefit plans.

246. The requested records included Summary Plan Descriptions, governing plan documents, contribution records, benefit records, employer reporting records, and other documents relating to Plaintiff's participation in the applicable employee benefit plans.

247. Before his termination, Plaintiff repeatedly requested clarification concerning employee benefits before making benefit elections through Defendants' onboarding process.

248. The plan administrator and/or any Defendant determined through discovery to have been responsible for responding to Plaintiff's requests failed to provide the requested documents within the time required by ERISA. Although Plaintiff later received certain annuity-related paperwork and a dues-refund check, the requested plan documents and records were not produced.

249. As a result, Plaintiff has been unable to verify his benefit rights, contributions, hours reported, employer reporting, eligibility status, and other rights under the applicable employee benefit plans.

250. The failure to provide the requested documents violated ERISA.

251. To the extent authorized by 29 U.S.C. § 1132(c), Plaintiff seeks statutory penalties against the responsible plan administrator, together with all other relief available under ERISA.

252. Count XI – Breach of Duty of Fair Representation

253. Plaintiff repeats and realleges ¶¶67–90 and ¶¶107–118 as though fully set forth herein.

254. Defendant Local 713 IBOTU, UMD, ILA owed Plaintiff a duty to represent him fairly, in good faith, and without arbitrary, discriminatory, or bad-faith conduct in matters relating to his employment, grievance, and request for representation.

255. Local 713 acted arbitrarily, discriminatorily, and in bad faith by failing to conduct a meaningful independent investigation into Plaintiff's eligibility for representation, actual job duties, reduction in managerial authority, grievance, and the circumstances surrounding his termination, and instead adopted Defendants' position regarding Plaintiff's alleged supervisory status before denying Plaintiff representation.

256. In the alternative, to the extent Local 713 contends Plaintiff was ineligible for union membership or representation, Local 713 is equitably estopped from asserting that position after accepting Plaintiff as a member, collecting union dues, administering union-related benefits, treating Plaintiff as a bargaining-unit employee throughout his employment, and reversing its position only after Plaintiff requested representation. Plaintiff reasonably relied upon Local 713's acceptance of his membership and continued payment of dues throughout his employment.

257. As a direct and proximate result of Local 713's breach of its duty of fair representation, Plaintiff was denied meaningful union representation, lost the opportunity to have his grievance properly investigated and pursued, and suffered damages.

258. Count XII – Unjust Enrichment (Pled in the alternative)

259. Plaintiff repeats and realleges ¶¶31–38, ¶¶120–128, ¶¶129–141, and ¶¶151–166 as though fully set forth herein.

260.     In the alternative to Plaintiff's breach-of-contract claim, and only to the extent the Court determines no enforceable contract governs the services, reimbursement transactions, or work product described herein, Plaintiff conferred substantial benefits upon Defendants beyond the scope of his contractual employment duties, including performing maintenance, plumbing, repair coordination, emergency operational repairs, advancing personal funds for repair-related expenses, providing transition planning and institutional knowledge, and creating operational work product that Defendants continued to use following Plaintiff's termination.

261.     Defendants knowingly accepted, retained, and benefited from those services and benefits, including avoiding contractor costs, avoiding the expense of recreating Plaintiff's operational systems and transition work, and retaining the value of Plaintiff's labor, expertise, and work product.

262.     Under principles of equity and good conscience, Defendants should not be permitted to retain those benefits without providing fair compensation.

263.     As a direct result, Plaintiff is entitled to restitution, disgorgement, and such other equitable relief as the Court deems just and proper.

## XIV. DAMAGES

264.     Plaintiff suffered damages as a direct result of Defendants' unlawful conduct, including back pay, front pay, lost wages, unpaid compensation, loss of benefits, loss of union-related contributions, loss of annuity and retirement-related contributions, and other economic harm arising from retaliation, termination, and related employment actions.

265.     As a direct and proximate result of Defendants' conduct, Plaintiff lost employer-provided health coverage and other employment benefits for himself and his family, including coverage affecting Plaintiff's dependent disabled child. Plaintiff incurred out-of-pocket medical expenses, lost the value of employer-paid health insurance and other employment benefits, experienced

delays and disruptions in obtaining necessary medical care, and is entitled to recover the value of those lost benefits and any restoration of benefits or equitable relief available under applicable law, including ERISA where applicable.

266.    Plaintiff received COBRA-related documentation through the union; however, Defendants' failure to provide clear and timely post-termination information caused confusion, delay, and disruption concerning Plaintiff's ability to understand and exercise benefits-related rights.

267.    Plaintiff incurred tax liability, accounting-related expenses, and financial harm arising from improper wage reporting, including the issuance of Form 1099-NEC for non-compensatory reimbursements.

268.    Plaintiff has devoted more than twenty-five years of his career to the senior living, nursing home, and long-term care industry. Plaintiff alleges that this industry frequently operates through affiliated owners, management companies, operating entities, and related corporate networks. As a result of Defendants' actions and termination, Plaintiff has experienced substantial difficulty obtaining comparable employment within the industry in which he has spent the majority of his professional career. Plaintiff previously maintained multiple income sources, including secondary employment, and has suffered ongoing economic harm, reduced earning capacity, loss of future employment opportunities, and loss of career advancement opportunities.

269.    Plaintiff further suffered physical harm when concerns arising from the concealed locker-room camera and the resulting workplace conflict, scrutiny, and retaliation caused Plaintiff to curtail a previously approved medical leave and return to work before his recovery was complete. As a result, Plaintiff's shoulder did not receive adequate time to heal, causing additional pain, discomfort, and physical limitations.

270.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, anxiety, humiliation, frustration, loss of trust in employers, reputational harm, and other non-economic damages.

271.    Plaintiff had devoted substantial time and effort to improving Defendants' operations, frequently performed work beyond the scope of his

53

position, remained available outside normal working hours, responded to work-related communications while off duty and on vacation, and repeatedly acted in what he reasonably believed to be Defendants' best interests. Plaintiff's termination after repeatedly engaging in protected activity caused significant emotional harm and undermined Plaintiff's confidence in future employment relationships.

272.    Defendants' conduct also placed substantial strain on Plaintiff's marriage and family life, including conflicts arising from Plaintiff's work-related obligations outside scheduled hours and Plaintiff's decision to curtail an approved medical leave and return to work before his shoulder had adequately healed because of the concealed-surveillance incident and the circumstances surrounding it.

273.    Plaintiff further suffered loss of enjoyment of life and disruption of his normal personal and family relationships as a result of Defendants' alleged conduct. The continuing financial uncertainty, loss of employment, ongoing litigation, delayed physical recovery, and emotional effects of the retaliation have adversely affected Plaintiff's daily life, family relationships, and overall quality of life.

274.    Plaintiff reserves the right to supplement and amend claims relating to damages based upon future medical evaluation, expert review, discovery, benefit-plan records, payroll records, tax records, and additional information obtained during litigation.

275.    Plaintiff is entitled to back pay, front pay, unpaid wages, lost employee benefits, compensatory damages, liquidated damages, statutory damages, statutory penalties, prejudgment and post-judgment interest, tax gross-up relief where appropriate, punitive damages where permitted, attorneys' fees where authorized, costs, disbursements, and all other relief available under applicable law.

## XV. JURY DEMAND

54

276.    Plaintiff demands a trial by jury on all issues so triable.

## XVI. PRAYER FOR RELIEF

277.    Plaintiff respectfully requests that the Court enter judgment in his favor and award all relief available under applicable federal and New York law, including compensatory damages; back pay; front pay; unpaid wages and benefits; restoration of employee benefit rights where authorized by law; compensation for the loss of health insurance and other employment benefits; restitution where appropriate; statutory damages and statutory penalties; liquidated damages; punitive damages where permitted by law; prejudgment and post-judgment interest; tax gross-up relief where appropriate; declaratory, equitable, and injunctive relief where authorized by law, including relief necessary to protect Plaintiff's rights under ERISA and other applicable law; costs and disbursements; attorneys' fees where authorized by law; and such other and further relief as the Court deems just and proper.

SIGNATURE

Dated:     July 09    , 2026

/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

347-854-8098

JosephFranqui26@outlook.com

55

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


## NOTICE OF MOTION TO EXTEND TIME TO COMPLETE SERVICE


PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, the

accompanying Proposed Order, and all prior proceedings herein, Plaintiff Joseph

1

Franqui, appearing pro se, respectfully moves this Court, pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, for an Order extending the time to complete service of process upon Defendants by sixty (60) days, or for such other period as the Court deems appropriate.

This request is made because Plaintiff has filed a Motion for Leave to File a Proposed Second Amended Complaint before any Defendant has been served or appeared. Granting an extension will permit Plaintiff to avoid the unnecessary expense and duplication associated with serving a pleading that may be superseded, will promote judicial economy, and will not prejudice any Defendant.

Plaintiff respectfully requests such other and further relief as the Court deems just and proper.

Dated:___July 09___, 2026

Staten Island, New York

Respectfully submitted,

/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION TO EXTEND TIME TO COMPLETE SERVICE**


**PRELIMINARY STATEMENT**


1

Plaintiff Joseph Franqui respectfully submits this Memorandum of Law in support of his Motion to Extend the Time to Complete Service pursuant to Rule 4(m) of the Federal Rules of Civil Procedure.

Plaintiff respectfully requests an extension of sixty (60) days, or such other period as the Court deems appropriate, to complete service of process.

**BACKGROUND**

This action remains at its earliest procedural stage. No Defendant has been served, no Defendant has appeared, no responsive pleading has been filed, and no scheduling order has been entered.

Plaintiff has filed a Motion for Leave to File a Proposed Second Amended Complaint before service upon any Defendant. The proposed amendment streamlines the pleadings by removing certain previously named Defendants, eliminating duplicative allegations, reorganizing portions of the complaint, and incorporating limited additional factual allegations identified during Plaintiff's continuing review of the facts and evidence.

Since commencing this action, Plaintiff has diligently reviewed the pleadings and evidence, actively sought legal counsel, maintained his remaining employment, and actively sought comparable replacement employment following the termination of his employment with Defendants.

**LEGAL STANDARD**

Rule 4(m) of the Federal Rules of Civil Procedure authorizes the Court to extend the time for service upon a showing of good cause and also permits the Court, in its discretion, to grant an extension when appropriate in the interests of justice.

**ARGUMENT**

Plaintiff has acted diligently in prosecuting this action.

Rather than immediately serving a complaint that Plaintiff determined should be streamlined and amended, Plaintiff promptly prepared and filed a Motion for Leave to File a Proposed Second Amended Complaint before any Defendant was served or appeared.

Granting an extension will avoid the unnecessary expense and duplication that could result from serving a complaint that may be superseded if the Motion for Leave to Amend is granted. It will also promote judicial economy by allowing service of a single operative complaint.

Plaintiff has also diligently attempted to retain counsel while continuing to review the pleadings and evidence, maintaining his remaining employment, and actively seeking comparable replacement employment following the termination of his employment with Defendants.

No Defendant will be prejudiced by the requested extension because no Defendant has yet been served or appeared in this action.

If the Court grants Plaintiff's Motion for Leave to File the Proposed Second Amended Complaint, the requested extension will also permit Plaintiff to promptly obtain

3

summonses, subject to the Clerk's Office procedures, and complete service of the operative complaint without unnecessary delay or additional expense.

Under these circumstances, good cause and the interests of justice support granting the requested extension.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court extend Plaintiff's time to complete service of process by sixty (60) days, or such other period as the Court deems appropriate, and grant such other and further relief as the Court deems just and proper.


Dated:    July 09    , 2026

Staten Island, New York

Respectfully submitted,


/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

4

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                           Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO EXTEND TIME TO COMPLETE SERVICE**

1

Upon Plaintiff Joseph Franqui's Motion to Extend Time to Complete Service, the accompanying Memorandum of Law, and all papers submitted in support thereof, and for good cause shown, it is hereby

ORDERED, that Plaintiff's Motion to Extend Time to Complete Service is GRANTED; and it is further

ORDERED, that Plaintiff's time to serve Defendants pursuant to Rule 4(m) of the Federal Rules of Civil Procedure is extended for sixty (60) days from the expiration of the current service deadline, or for such other period as the Court deems appropriate; and it is further

ORDERED, that Plaintiff shall complete service of the operative complaint in accordance with the Federal Rules of Civil Procedure and any further Orders of this Court.

SO ORDERED.


Dated: _____, 2026

Brooklyn, New York


_____

HON. DIANE GUJARATI

United States District Judge

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**NOTICE OF MOTION FOR PERMISSION TO PARTICIPATE IN ELECTRONIC CASE FILING (CM/ECF)**


PLEASE TAKE NOTICE that, upon the accompanying Memorandum of Law, the accompanying Proposed Order, and all prior proceedings herein, Plaintiff Joseph

1

Franqui, appearing pro se, respectfully moves this Court for an Order permitting Plaintiff to participate in the Court's Electronic Case Filing ("CM/ECF") system, pursuant to the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Eastern District of New York, and the Court's applicable procedures governing electronic filing by pro se litigants.

Plaintiff respectfully submits that participation in CM/ECF will promote the efficient administration of this action by allowing Plaintiff to receive electronic notice of filings and Court orders, file documents electronically, and efficiently prosecute this action. If Plaintiff's pending Motion for Leave to File a Second Amended Complaint is granted, electronic filing will also assist Plaintiff in promptly obtaining any issued summonses, subject to the Clerk's Office procedures, so that service of the operative complaint may be completed without unnecessary delay or expense.

Plaintiff respectfully requests that the Court grant this Motion and such other and further relief as the Court deems just and proper.

Dated:＿＿＿July 09＿＿, 2026

Staten Island, New York

Respectfully submitted,


/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

2

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR PERMISSION TO PARTICIPATE IN ELECTRONIC CASE FILING (CM/ECF)**


1

**PRELIMINARY STATEMENT**

Plaintiff Joseph Franqui respectfully submits this Memorandum of Law in support of his Motion for Permission to Participate in the Court's Electronic Case Filing ("CM/ECF") system.

Granting this motion will promote the efficient administration of this action by allowing Plaintiff, who is proceeding pro se, to receive Court notices, orders, and docket activity electronically and to file future papers in a timely and efficient manner.

**BACKGROUND**

Plaintiff is proceeding without counsel.

Plaintiff has reliable access to a computer, the internet, and electronic mail and is capable of complying with the Court's electronic filing procedures.

This action remains at an early procedural stage. Plaintiff has filed a Motion for Leave to File a Second Amended Complaint and a Motion to Extend Time to Complete Service. No Defendant has been served, no Defendant has appeared, no responsive pleading has been filed, and no scheduling order has been entered.

**ARGUMENT**

Participation in CM/ECF will promote the efficient administration of this action and assist Plaintiff in complying with future filing deadlines and Court orders.

Electronic filing will permit Plaintiff to receive Court notices and orders promptly, reduce unnecessary delays associated with paper filings, and facilitate efficient communication with the Court.

If Plaintiff's pending Motion for Leave to File a Second Amended Complaint is granted, participation in CM/ECF will also assist Plaintiff in promptly obtaining any issued summonses, subject to the Clerk's Office procedures, so that service of the operative complaint may be completed without unnecessary delay or additional expense.

Granting this motion will promote judicial economy and assist Plaintiff in efficiently prosecuting this action while complying with the Federal Rules of Civil Procedure, the Local Civil Rules of the Eastern District of New York, and the Court's Individual Practice Rules.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff permission to participate in the Court's Electronic Case Filing (CM/ECF) system and grant such other and further relief as the Court deems just and proper.

Dated:    July 09   , 2026

Staten Island, New York

Respectfully submitted,


/s/ Joseph Franqui

Joseph Franqui

Plaintiff Pro Se

262 Maybury Avenue

Staten Island, New York 10308

(347) 854-8098

JosephFranqui26@outlook.com

3

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

JOSEPH FRANQUI,

Plaintiff,

v.                                                    Case No. 1:26-cv-02867-DG-RML

ESPLANADE STATEN ISLAND LLC,

CENTER MANAGEMENT GROUP LLC,

RICHMOND 26 OPERATING LLC d/b/a

ESPLANADE STATEN ISLAND,

WOODMERE OPERATING COMPANY LLC d/b/a

ESPLANADE OF WOODMERE,

MERIDIAN SENIOR LIVING, LLC,

LOCAL 713 IBOTU, UMD, ILA,

PATRICE FICCO,

HINDEL JESSELSON,

CHARLES-EDOUARD GROS,

MEIRA PIRUTINSKY,

JEFF ELKINS,

AARON BOKCHIN,

ALEXANDER "ALI" SCHARF,

and DOES 1–50,

Defendants.


**[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION FOR PERMISSION TO
PARTICIPATE IN ELECTRONIC CASE FILING (CM/ECF)**


1

Upon Plaintiff Joseph Franqui's Motion for Permission to Participate in Electronic Case Filing (CM/ECF), the accompanying Memorandum of Law, and all papers submitted in support thereof, and for good cause shown, it is hereby

ORDERED, that Plaintiff's Motion for Permission to Participate in Electronic Case Filing (CM/ECF) is GRANTED; and it is further

ORDERED, that Plaintiff is authorized to participate in the Court's Electronic Case Filing (CM/ECF) system in accordance with the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the Eastern District of New York, the Court's Individual Practice Rules, and the Clerk of Court's applicable CM/ECF procedures and requirements; and it is further

ORDERED, that Plaintiff shall comply with all applicable rules and procedures governing electronic filing throughout this action.

SO ORDERED.


Dated: _____, 2026

Brooklyn, New York


_____

HON. DIANE GUJARATI

United States District Judge

2